**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| **EMILY WRIGHT, TIFFANY WILSON, KRISHNENDU CHAKRABORTY, and MICHAEL BROFMAN on behalf of themselves and all others similarly situated,** | |
| **Plaintiffs,** | **Civil Action No. 1:21-cv-803** |
| **v.** | **CLASS ACTION COMPLAINT** |
| **CAPITAL ONE BANK (USA), N.A.; AND CAPITAL ONE, N.A.,** | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................ 2

THE PARTIES .................................................................................................... 8

    A.    Defendants ......................................................................... 8

    B.    Plaintiffs ............................................................................. 9

FACTUAL ALLEGATIONS ........................................................................... 11

    A.    Overview of the Payment Card Foreign Exchange Market ................... 11

    B.    Applicable Contractual Provisions ....................................... 15

        1.    Capital One's Agreements with Class Members. .................... 16

        2.    Capital One's Agreements with Visa and Mastercard. ............ 17

    C.    Capital One Charged Unlawful Foreign Exchange Rates in Violation of its Contracts ................................................................... 20

CLASS ACTION ALLEGATIONS ................................................................. 23

CLAIMS FOR RELIEF .................................................................................... 26

PRAYER FOR RELIEF .................................................................................... 34

DEMAND FOR JURY TRIAL ........................................................................ 35

Plaintiffs Emily Wright, Tiffany Wilson, Krishnendu Chakraborty, and Michael Brofman (collectively, "Plaintiffs"), allege the following claims for relief against Defendants Capital One Bank (USA), N.A., and Capital One, N.A. (together, "Capital One" or "Defendants").

## INTRODUCTION

1.    Capital One is a nationally chartered banking association that offers deposit accounts, investment and financial services, mortgage and non-mortgage loans facilities, and credit cards issued to consumer and business clients. Capital One issues both Visa-branded and Mastercard-branded credit and debit cards.

2.    Visa Inc., Visa U.S.A. Inc., and Visa International Service Association (collectively "Visa") are together a U.S.-based multinational financial services corporation that processes electronic funds transfers throughout the world through their electronic payments network (known as "VisaNet"), most commonly through Visa-branded credit cards, debit cards, and prepaid cards (collectively, "payment cards").

3.    Mastercard Incorporated and Mastercard International Incorporated (collectively "Mastercard") are together a U.S.-based multinational financial services corporation that processes electronic funds transfers throughout the world through their electronic payments network through Mastercard-branded payment cards.

4.    Plaintiffs and members of the proposed Classes are current and former Capital One payment card customers in the U.S. who were issued Capital One Visa-branded and/or Mastercard-branded payment cards, and used those cards to transact in foreign currencies.

5.    Visa and Mastercard (collectively, the "Processors") do not issue payment cards directly to consumers. Instead, they provide financial institutions—including Capital One—with

Visa and Mastercard-branded payment products that the financial institutions then use to offer credit and debit cards to their cardholders.

6.    Visa and Mastercard require the banks that issue Visa and Mastercard-branded payment cards (the "member banks") to agree to be bound by certain rules of Visa and Mastercard. These rules provide, *inter alia*, that the foreign exchange ("FX") rates applied to consumer payment card transactions in foreign currencies for each day will either be wholesale FX market rates or a government-mandated rate. The vast majority of jurisdictions do not have government-mandated rates.[1]

7.    The Visa and Mastercard rules also provide that the member banks must provide specific disclosures to payment card cardholders describing what FX rates will be imposed.

8.    Capital One requires all of its payment cardholders, including all Plaintiffs and members of the proposed Classes, to agree to the terms of standardized credit card agreements ("Credit Card Agreements") (for credit cards) and deposit account and debit card agreements ("Deposit Account Agreements") (for debit cards) as a condition of being issued a Capital One payment card. Capital One's Credit Card Agreements and Deposit Account Agreements are collectively referred to herein as "Cardholder Agreements."

9.    Capital One, includes language referencing the Visa and Mastercard rules in the Cardholder Agreements, promising cardholders, including Plaintiffs and Class Members, that the

---

[1]  Some countries use fixed exchange rate systems, sometimes called a pegged exchange rate, in which their respective currency's value is fixed or pegged by a monetary authority against the value of another currency, such as the U.S. Dollar. For example, the Bermudian dollar is pegged to the U.S. Dollar at a one-to-one ratio by the Bermuda Monetary Authority. The Processors do not apply government-mandated exchange rates for foreign payment card transactions in the limited set of countries that have adopted fixed exchange rate systems; instead, they adjust the rates to provide a profit for themselves. For all other currencies, Capital One's contracts with its cardholders all provide that wholesale FX market rates will be applied.

FX rates applied to foreign transactions will be either wholesale market rates or, in jurisdictions that have them, government-mandated rates.

10. Contrary to the Cardholder Agreements between Capital One and Plaintiffs and members of the proposed Classes, the FX rates applied to cardholder transactions do not represent rates available in the wholesale FX market.

11. Further, even when the FX rates imposed by Visa and Mastercard are within the trading ranges of the individual currencies within the wholesale market for the applicable dates, the methods by which the rates are imposed are unfair, in bad faith, and therefore in violation of the Cardholder Agreements.

12. Based on the language of their Credit Card Agreements, cardholders reasonably expect (and are led to believe) that the member banks are charging wholesale rates that bear some resemblance to the rates that the Processors and the banks themselves receive because the Processors and banks are themselves transacting in foreign currencies to facilitate the cardholders' transactions. In fact, however, the banks and Processors rarely engage in wholesale market transactions to facilitate the cardholders' transactions. The Processors settle many of the so called "foreign" transactions by U.S. cardholders with foreign merchants in U.S. Dollars, meaning neither the banks nor Processors engage in any currency conversion at all. In these instances, the need for any currency conversion is a pure fiction, and any hidden charge for the same, and/or the manipulation of FX rates in breach of the Credit Card Agreements, is unlawful. While the price the U.S. cardholder was quoted was in a foreign currency at the point of sale, the cardholder's account was in fact debited in U.S. Dollars, and the foreign merchant was paid in currency U.S. Dollars, meaning there was no foreign currency involved in the transaction at all.

13.     Even in transactions that Processors actually settle in foreign currencies, the need for currency exchange is minimal. The Processors are engaged in multilateral global transactions on a massive scale (*i.e.*, doing multiple transactions in both directions—*e.g.*, U.S. Dollars to Euros, and Euros to U.S. Dollars). As a result of all these transactions, the Processors are constantly in possession of large amounts of various currencies. Given their own currency balances, the Processors only need to engage in foreign currency transactions to settle any *net* currency settlement requirements.

14.     In sum, the FX rates that the Processors impose and that member banks, including Capital One, charge cardholders for foreign transactions are largely a fiction and represent a non-transparent charge. They bear no resemblance to any exchange rate obtained or which could be obtained by the banks or the Processors in wholesale markets, as many times the Processors exchanged no currency whatsoever (because the transaction was settled in U.S. Dollars or because the Processors had foreign currency on hand to settle the transaction with the foreign merchant) or traded at spot or forward FX prices.

15.     Instead of approximating the member banks' and the Processors' actual costs of acquiring foreign currency to settle transactions, the rates the Processors impose and banks, including Capital One, charge consumers for FX transactions are designed to maximize profits for the banks and the Processors. Specifically, the rates imposed vary based on the direction of the transaction, and nearly always favor the banks and Processors. For example, for any given processing date, the rate imposed for converting U.S. Dollars to Euros will be significantly different from the inverse rate for converting Euros to U.S. Dollars. In both instances, it will be outside—or at the very high end of—the daily ranges of wholesale market rates for each currency

conversion. This means that the cardholder will always get the worst rate and the Processors will always get the best rate.

16.     Wholesale FX market participants make offers to purchase foreign currencies (referred to as a "bid" price), sell FX (the "ask price"), and the difference between the bid and the ask is called the "bid-ask spread." Because the trading volume is so large, bid-ask spreads in the wholesale FX market are generally exceedingly small.

17.     Despite the fact that wholesale market rates are expressed as a bid-ask at a given point in time, the rates imposed by the Processors are not contemporaneous (*i.e.*, from a bid-ask at a given point in time on the wholesale market). Instead, the spread between the two rates imposed by the Processors for each currency pair (e.g., the spread between the rates for Euro to U.S. Dollar and U.S. Dollar to Euro) exceeds the normal bid-ask spread by considerable margins, much greater than those at any given point in time on the markets themselves. In other words, the Processors and banks create a fictional bid-ask spread (the highest rate in the day versus the lowest rate in the day), and then manipulate the rate applied to Class Member transactions so that the members of the proposed Classes either always get the worst possible rate in either direction, or in fact are applied rates that are even outside of this fictional bid-ask spread, making it even worse for these consumers. This practice renders the promise of a rate from the wholesale markets illusory, as the Processors are acting in a way no party to the contract would have reasonably expected—not to impose a bid-ask from the markets at any given point in time, but to impose a bid from one point in time, and an ask from an entirely different point in time—and then applying the worst possible rate for the cardholder in every case in both directions.

18.    This means that the FX rates imposed are excessively costly for cardholders and unreasonably profitable for the banks, including Capital One, and the Processors.

19.    The imposition of high exchange rates operates to the member banks' benefit because it inflates the overall value of the transaction. This leads to a larger credit card balance which translates to higher interest payments on card balances. For transactions where the cardholder is also obligated to pay a percentage of the transaction as a foreign transaction fee, inflating the total transaction amount also translates into a higher fee for the bank on a percentage basis. The Processors make money on the difference between the rate they charge consumers to engage in the foreign transaction, and the rate (if any) the Processors actually pay to acquire the foreign currency used to settle the transaction. When transactions are settled in the consumer's home currency (where no foreign currency is used at all), the Processors' hidden manipulation of the FX rates charged to cardholders enables them and the banks, including Capital One, to profit at the expense of cardholders. Because the Processors also receive a percentage of the value of each transaction as a processing fee, they also benefit directly from inflated transaction amounts.

20.    Members of the proposed Classes transacted millions of dollars in foreign currencies with their Visa and Mastercard-branded Capital One payment cards during the relevant time period. Capital One's illegal conduct has caused Plaintiffs and the Class Members to pay more for foreign transactions than they would have paid if Capital One had complied in good faith with their contractual obligations to charge wholesale FX market rates rather than contrived rates. Class Members paid more because the FX rates were less favorable than those promised in the relevant contracts (thereby diminishing Class Members' purchasing power) and also because Defendants' conduct inflated the amount involved in each transaction, thereby causing Class Members to pay higher foreign transaction fees, which are usually a percentage of the total

transaction amount, and to pay more in credit card interest than they would have had to pay had the transaction value not been improperly inflated.

## JURISDICTION, VENUE, AND INTERSTATE COMMERCE

21.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d), in that this is a class action in which the aggregate amount in controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed Classes are citizens of a state different from Defendants.

22.    The Court has personal jurisdiction over Defendants because Defendants' unlawful acts took place, in substantial part, in Virginia. Defendants have continuously and systematically transacted FX in this District and throughout the United States. Defendants are headquartered in, maintain their principal place of business in, and maintain offices in, Virginia.

23.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b). Defendants are headquartered in, reside, transact business, are found, and have agents in this District. Additionally, a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

## THE PARTIES

**A.    Defendants**

24.    Defendant Capital One Bank (USA), N.A. is a federally chartered national banking association with its principal place of business in McLean, Virginia. Capital One Bank (USA), N.A. issues both Visa-branded and Mastercard-branded payment cards.

25.     Defendant Capital One, N.A. is a federally chartered national banking association with its principal place of business in McLean, Virginia. Capital One, N.A. issues both Visa-branded and Mastercard-branded payment cards.

26.     Capital One, N.A. and Capital One Bank (USA), N.A. are referred to collectively herein as "Capital One" or "Defendants."

**B.     Plaintiffs**

27.     Plaintiff Emily Wright is an individual and a resident of Seattle, Washington. During the relevant time period, Ms. Wright engaged in payment card transactions in Euros ("EUR"), Croatian Kuna ("HRK"), and British Pounds ("GBP") with her Capital One issued Visa-branded credit card. In violation of Capital One's promises in its Credit Card Agreement with Ms. Wright, Capital One charged Ms. Wright rates that were outside the range of bid-ask spreads on wholesale market rates (for some transactions) and at the very high end of wholesale rates (for other transactions) for U.S. Dollar to Euro ("EUR/USD"), U.S. Dollar to Croatian Kuna ("USD/HRK"),  and U.S. Dollar to British Pound ("GBP/USD") exchange rates. Capital One charged these rates not in good faith, but in an effort to maximize Capital One's profits at Ms. Wright's expense, in violation of Capital One's obligations and Ms. Wright's reasonable expectations that Capital One would act in good faith and treat Ms. Wright fairly. The FX rates that Capital One charged Ms. Wright were more costly to Ms. Wright than they would have been if the rates had been imposed reasonably from within the wholesale market rate range pursuant to the Credit Card Agreement Capital One imposed on Ms. Wright.

28.     Plaintiff Tiffany Wilson is an individual and a resident of Raeford, North Carolina. During the relevant time period, Ms. Wilson engaged in payment card transactions in New Zealand Dollars ("NZD"), Peruvian Sol ("PEN"), and Chilean Pesos ("CLP"), with her Capital One issued

9

Mastercard-branded credit card. In violation of Capital One's promises in its contract with Ms. Wilson, Capital One charged Ms. Wilson rates that were outside the range of bid-ask spreads on wholesale market rates (for some transactions) and at the very high end of wholesale rates (for other transactions) for U.S. Dollar to in New Zealand Dollars ("NZD/USD"), U.S. Dollar to Peruvian Sol ("USD/PEN"), and U.S. Dollar to Chilean Pesos ("GBP/CLP") exchange rates. Capital One charged these rates not in good faith, but in an effort to maximize Capital One's profits at Ms. Wilson's expense, in violation of Capital One's obligations and Ms. Wilson's reasonable expectations that Capital One would act in good faith and to treat Ms. Wilson fairly. The FX rates that Capital One charged Ms. Wilson were more costly to Ms. Wilson than they would have been if the rates had been imposed reasonably from within the wholesale market rate range pursuant to the Credit Card Agreement Capital One imposed on Ms. Wilson.

29.    Plaintiff Krishnendu Chakraborty is an individual and a resident of Burlington, Massachusetts. During the relevant time period, Mr. Chakraborty engaged in payment card transactions in Euros ("EUR"), Indian Rupee ("INR"), and Swiss Francs ("CHF") with his Capital One issued Visa-branded credit card. In violation of Capital One's promises in its contract with Mr. Chakraborty, Capital One charged Mr. Chakraborty rates that were outside the range of bid-ask spreads on wholesale market rates (for some transactions) and at the very high end of wholesale rates (for other transactions) for U.S. Dollar to Euro ("EUR/USD"), U.S. Dollar to Indian Rupee ("USD/INR"), and U.S. Dollar to Swiss Francs ("CHF/USD") exchange rates. Capital One charged these rates not in good faith, but in an effort to maximize Capital One's profits at Mr. Chakraborty's expense, in violation of Capital One's obligations and Mr. Chakraborty's reasonable expectations that Capital One would act in good faith and treat Mr. Chakraborty fairly. The FX rates that Capital One charged Mr. Chakraborty were more costly to Mr. Chakraborty than

they would have been if the rates had been imposed reasonably from within the wholesale market rate range pursuant to the Credit Card Agreement Capital One imposed on Mr. Chakraborty.

30.    Plaintiff Michael Brofman is an individual and a resident of Denver, Colorado. During the relevant time period, Mr. Brofman engaged in payment card transactions in Australian Dollars ("AUD") with his Capital One issued Mastercard-branded credit card. In violation of Capital One's promises in its contract with Mr. Brofman, Capital One charged Mr. Brofman rates that were outside the range of bid-ask spreads on wholesale market rates (for some transactions) and at the very high end of wholesale rates (for other transactions) for U.S. Dollar to Australian Dollar ("USD/AUD") exchange rates. Capital One charged these rates not in good faith, but in an effort to maximize Capital One's profits at Mr. Brofman's expense, in violation of Capital One's obligations and Mr. Brofman's reasonable expectations that Capital One would act in good faith and treat Mr. Brofman fairly. The FX rates that Capital One charged Mr. Brofman were more costly to Mr. Brofman than they would have been if the rates had been imposed reasonably from within the wholesale market rate range pursuant to the Credit Card Agreement Capital One imposed on Mr. Brofman.

## FACTUAL ALLEGATIONS

### C.    Overview of the Payment Card Foreign Exchange Market

31.    When a U.S. consumer makes a payment card transaction in U.S. Dollars with a U.S. merchant, the merchant runs the physical card (or card information, for an online or phone order) through its payment card terminal, the card information is submitted to the Processor's electronics payment system, and the system sends information about the transaction to the cardholder's issuing bank to make sure the cardholder has enough money or credit available to complete the purchase, and to confirm that the card is valid and not lost, stolen, fake or expired.

The transaction is then approved or declined. For approved transactions, the merchant's account is credited in U.S. Dollars (minus an "interchange fee" paid by the merchant to the bank that issued the consumer's card) and the consumer's account is debited for the full amount of the transaction in U.S. Dollars. Visa and Mastercard set default interchange fees on payment card transactions that merchants are required to pay to the issuing banks.

32.     When a U.S. consumer makes a payment card transaction denominated in a foreign currency with an overseas merchant, the consumer's payment card account is debited for the transaction in U.S. Dollars, and the merchant is credited for the transaction in either its home currency or some other agreed-upon currency, such as U.S. Dollars (minus the interchange fee). Regardless of the currency in which the transaction is actually settled, the Processor performs a calculation whereby the amount the consumer pays is determined as if the transaction had been settled in a foreign currency. The exchange rate used for this purpose is determined by the Processor.

33.     The exchange rate used by the Processor to convert foreign currencies is applied on the "processing date" of each foreign payment card transaction. The processing date for a payment card transaction is the date on which the issuing bank submits the transaction information to the Processor and the Processor accepts that information.

34.     For many payment card foreign transactions, the issuing bank charges a "foreign exchange fee," calculated as a percentage of the total transaction amount. Capital One's Credit Card Agreements advertise foreign transaction fees ranging from 0% (i.e., no foreign transaction fee) to 3%.[2]

---

[2] See, e.g., https://www.capitalone.com/credit-cards/lp/credit-card-agreements/ (last accessed July 1, 2021).

35.     Payment card contracts between consumers and member banks, like Capital One, provide that conversion rates for foreign transactions will be determined by the Processor pursuant to the Processor's operating procedures. Visa's and Mastercard's operating procedures for currency conversions are set forth in their respective guidelines. Capital One's Cardholder Agreements and the Processors' guidelines are detailed below.

36.     Among the largest participants in the wholesale FX market are dealer banks such as Deutsche Bank, JPMorgan, Citigroup, Barclays, UBS, Bank of America, and HSBC. Dealer banks trade foreign currency with each other and with other large financial institutions including Visa and Mastercard. Wholesale FX market rates are streamed to dealer banks in real time on major multi-bank FX trading platforms including Reuters and Bloomberg. Wholesale FX market participants use these platforms to make offers to purchase foreign currencies and analyze historical wholesale FX market prices.

37.     Visa and Mastercard also engage in foreign currency transactions with dealer banks. The Processors engage in such transactions to mitigate the risk associated with foreign currency exchange rate fluctuations,[3] and to obtain currencies necessary to cover their cardholders' foreign currency payment card transactions.

38.     However, the Processors do not engage in parallel foreign currency transactions on the wholesale FX market for individual cardholder transactions, either on a per-transaction basis, or even on a daily basis.

---

[3] *See infra* n.11.

39.     Instead, the Processors maintain derivative contracts and reserves of currency and move funds between reserves as needed.[4]

40.     As one court found, the Processors also incur "minimal currency conversion costs." *Schwartz v. Visa Int'l Corp.*, No. 822404-4, 2003 WL 1870370, at *28 (Cal. Super. Ct. Apr. 7, 2003).

41.     Because the Processors generally settle foreign transactions in both directions for a given currency pair (*e.g.*, Visa has U.S. cardholders making purchases both in Europe and European cardholders making purchases in the U.S.), the Processors are only required to "settle" the net amount of each given currency for each day. In other words, if a hypothetical Processor processed $1 billion in transactions from Euros to Dollars and the same amount from Dollars to Euros on a particular day, the Processor would not need to engage in any actual FX transactions in the wholesale market on that day.

42.     Moreover, in many instances where U.S. consumers are quoted a price in a foreign currency (i.e., Euros), the Processors settle the transactions with the foreign merchant using U.S. Dollars. In these instances, no foreign currency whatsoever is required. The U.S. consumer's account is debited in U.S. Dollars, and the merchant is paid in U.S. Dollars. The Processors have

---

[4] "The Company uses foreign exchange forward derivative contracts to reduce its exposure to foreign currency rate changes on forecasted non-functional [i.e. non-U.S. dollar] currency denominated operational cash flows." *See* Visa Inc., 2017 Form 10-K, *available at* http://d18rn0p25nwr6d.cloudfront.net/CIK-0001403161/cd6545c2-6c6e-4ba1-8dcd-52cd1521df3a.pdf, at 66 (last accessed July 1, 2021); *see also id.* at 50 ("Risks from foreign currency exchange rate fluctuations are primarily related to adverse changes in the functional currency value of revenues generated from foreign currency-denominated transactions and adverse changes in the functional currency value of payments in foreign currencies. We manage these risks by entering into foreign currency forward contracts that hedge exposures of the variability in the functional currency equivalent of anticipated non-functional currency denominated cash flows. Our foreign currency exchange rate risk management program reduces, but does not entirely eliminate, the impact of foreign currency exchange rate movements.").

no foreign exchange risk for these transactions. The idea that the consumer purchased in a foreign currency in such a transaction is a pure fiction.

43.     For all these reasons, the rates that the Processors impose on cardholders are not representative of the rates the Processors actually pay for foreign currency. Nor are they reflective of any other costs associated with currency conversion that Processors bear. Instead, the Processors and Capital One are engaged in arbitrage: they set rates to maximize profits—and do so without regard to the terms of the contracts that they imposed on card members.

### D.     Applicable Contractual Provisions

44.     The contractual obligations between Capital One and Capital One's credit card cardholders—including Plaintiffs and members of the proposed Classes—are set forth in Capital One's "Credit Card Agreement." The Credit Card Agreement is provided to credit card applicants who must accept the terms prior to the issuance of each credit card.

45.     The contractual obligations between Capital One and Capital One's debit card cardholders—including Plaintiffs and members of the proposed Classes—are set forth in Capital One's "Deposit Account Agreement." The Deposit Account Agreement is provided to checking and savings account applicants who must accept the terms prior to the issuance of a new account, and prior to the issuance of a debit card associated with a deposit account.

46.     The Processors' relationships with Capital One are also governed by written agreements. For Visa, these terms are memorialized in the Visa Core Rules and VISA Product and Service Rules ("the Visa Rules").[5] For Mastercard, these terms are memorialized in the Mastercard

---

[5] Visa Core Rules and Visa Product and Service Rules, Oct. 17, 2020, *available at*, https://usa.visa.com/dam/VCOM/download/about-visa/visa-rules-public.pdf (the "Visa Rules").

Rules.[6] In each of these documents, banks that issue Visa and Mastercard payment cards to their cardholders (including Capital One) are referred to as the "Issuers."

### 1.    Capital One's Agreements with Class Members.

47.    Capital One is a member of Visa's network (for its Visa-branded cards) and Mastercard's network (for its Mastercard-branded cards).

48.    Capital One maintains a uniform Credit Card Agreement for each Capital One issued credit card product, and a Deposit Account Agreement for each Capital One issued debit card product. The terms and conditions set forth in these Cardholder Agreements—including the provisions regarding foreign currency exchange rates—are substantially similar across all of Capital One's Cardholder Agreements, including Agreements for Visa-branded and Mastercard-branded payment card products. For example, the Credit Card Agreement for the Capital One Visa Signature Card is substantially the same as the Credit Card Agreement for the Capital One VentureOne Rewards Mastercard.

49.    At all times relevant to this Complaint, all of Capital One's consumer Visa and Mastercard Cardholder Agreements contained substantially similar foreign currency language. Specifically, for all Visa and Mastercard-branded payment cards issued by Capital One during the relevant time period, Capital One's Cardholder Agreements required the FX rates imposed on Capital One's cardholders to be either (1) a wholesale FX market rate, or (2) a government-mandated rate in effect one day prior to the processing date.

---

[6]    Mastercard    Rules,    Dec.    11,    2020,    *available    at* https://www.mastercard.us/content/dam/mccom/global/    documents/mastercard-rules.pdf (the "Mastercard Rules").

50.    The language used across all these Agreements was similar in relevant part. As of

July 1, 2021, Capital One's Credit Card Agreement provided in relevant part:[7]

> If you make a transaction in a foreign currency, the Payment Card Network will
> convert it into a U.S. dollar amount. The Payment Card Network will use its own
> currency conversion procedures. The conversion rate in effect on the processing
> date may differ from the rate in effect on the transaction date that appears on your
> Statement.

51.    Capital One's Deposit Account Agreements contained similar language as of July

1, 2021, providing:

> Transactions made with your card in foreign currencies and transactions that are classified
> by MasterCard® as "cross-border transactions" (generally, transactions that are processed
> outside the United States) are called "foreign transactions." If a foreign transaction is in a
> foreign currency, it will be posted to your account in U.S. dollars. The exchange rate
> between the foreign currency and U.S. dollars is a rate selected by MasterCard®. Basically,
> here's how MasterCard® calculates the exchange rate: They usually start with either a
> government-mandated currency rate or a wholesale rate as of the day your foreign
> transaction is processed (i.e., not the date you made your purchase and not the date your
> purchase is posted on your statement).[8]

52.    Contrary to the terms of Capital One's Credit Card Agreements, Visa and

Mastercard did not in fact apply their currency conversion procedures for credit card transactions

as set forth in the Visa Rules and Mastercard Rules detailed below. Contrary to the terms of Capital

One's Deposit Account Agreements, Visa and Mastercard did not in fact apply government-

mandated currency rates or wholesale rates for debit card transactions as required by the Visa

Rules and Mastercard Rules detailed below.

**2.    Capital One's Agreements with Visa and Mastercard.**

53.    Both Visa and Mastercard require member banks, including Capital One, to make

specific disclosures to consumers about how FX rates will be determined.

---

[7] https://ecm.capitalone.com/WCM/card/credit-card-agreement-for-consumer-cards-in-capital-one-bank-usa-na.pdf

[8] https://www.capitalone.com/bank/checking-accounts/online-checking-account/disclosures/

54.    Section 1.4.3.2 of the Visa Rules, as updated on October 17, 2020 and as in effect during the relevant period, provides:

> An Issuer must provide a complete written disclosure of any fees that may be charged to a Cardholder for an International Transaction or when Currency Conversion occurs and must include the exchange rate between the Transaction Currency and the Billing Currency as either of the following:
>
> A rate selected by Visa from the range of rates available in wholesale currency markets for the applicable Processing Date, which rate may vary from the rate Visa receives; [or] The rate mandated by a government or governing body in effect for the applicable Processing Date
>
> When Currency Conversion occurs, the Visa rate may be adjusted by the application of an Optional Issuer Fee as determined by the Issuer or via any Issuer self-determined markup outside of VisaNet.
>
> An Issuer may choose the method by which it notifies the Cardholder. This may include one or more of the following, which may include electronic forms of communication:
>
>  Original Cardholder application agreement
>  Terms and conditions
>  Billing statement
>  Any other agreement between the Cardholder and the Issuer.

55.    Like the Visa Rules, the Mastercard Rules also indicate member banks, including Capital One, should inform their cardholders that Mastercard will apply either a wholesale FX market rate or a government-mandated exchange rate to apply to cardholder payment card transactions.

> **Currency Conversion Procedure.** The [Mastercard] Corporation further recommends and encourages Issuers to inform their Cardholders that part of the Corporation's currency conversion procedure includes use of either a government-mandated exchange rate or a wholesale exchange rate, selected by the Corporation, and that the government-mandated exchange rate or wholesale exchange rate that the Corporation uses for a particular Transaction is the rate the Corporation selects for the applicable currency on date that the Transaction is processed (the Central Site Business Date), which may differ from the rate selected on the date the Transaction occurred or on the date the Transaction is posted to the Cardholder's Account.

*See* Mastercard Rules at 125.

56.    Both Visa and Mastercard mitigate foreign exchange risk by purchasing futures, and do not engage in daily trading to ensure their currency needs are satisfied.[9]

57.    Notably, while Capital One's Cardholder Agreements indicate that the rates imposed will be either wholesale market rates or government-established rates, Capital One's Agreements do not disclose any of the following:

- That the rates will be "selected" by the Processors for the Processors' and the bank's sole benefit;

- That, in many instances, the rate is fictitious in the sense of not being derived from an actual transaction and often being outside the range of prices in the wholesale markets because the transactions are being settled in the consumer's home currency, and that the rate "selected" by the Processors will be different than the rate actually used to settle the transaction;

- That rates will vary depending on the direction of the currency exchange, and will not be selected from bid-ask rates available contemporaneously on the wholesale

---

[9] *See* Visa Inc., 2017 Form 10-K, *available at* http://d18rn0p25nwr6d.cloudfront.net/CIK-0001403161/cd6545c2-6c6e-4ba1-8dcd-52cd1521df3a.pdf, at 66 (last accessed Jan. XX, 2021) (noting that Visa uses "currency forward contracts entered into to mitigate a portion of our foreign currency exchange rate risk"); Mastercard Incorporated, 2018 Form 10-K, *available at* http://d18rn0p25nwr6d.cloudfront.net/CIK-0001141391/bb8f61d2-403e-4be9-aee2-70eda24fdce9.pdf (last accessed Jan. XX, 2021) ("**Foreign Exchange Risk Management.** The Company monitors and manages its foreign currency exposures as part of its overall risk management program which focuses on the unpredictability of financial markets and seeks to reduce the potentially adverse effects that the volatility of these markets may have on its operating results. A primary objective of the Company's risk management strategies is to reduce the financial impact that may arise from volatility in foreign currency exchange rates principally through the use of both foreign currency derivative contracts (Derivatives) and foreign currency denominated debt (Net Investment Hedge)").

market, but will instead be selected for the sole purpose of maximizing the banks

and the Processors' profits at the expense of cardholders; and

- That the rates imposed will vary from any actual rates obtained by the Processors

  and the bank to the extent either engages in wholesale market transactions on the

  processing date.

**E.    Capital One Charged Unlawful Foreign Exchange Rates in Violation of its Contracts**

58.    Defendants' exchange rate practices with respect to Visa and Mastercard-branded

cards violate Capital One's Cardholder Agreements.

59.    Contrary to the terms of Capital One's Credit Card Agreements, Visa did not in fact

apply its currency conversion procedures for credit card transactions as set forth in the Visa Rules.

Contrary to the terms of Capital One's Deposit Account Agreements, Visa did not in fact apply

government-mandated currency rates or wholesale rates for debit card transactions as required by

the Visa Rules detailed below. Instead, Visa imposes, and Capital One charges, rates that are—for

most currencies and on most dates—entirely outside of the range of wholesale market rates in a

direction that is disadvantageous for the cardholders and advantageous for Visa and Capital One.

60.    A detailed analysis of Visa's historical exchange rates during the relevant period

demonstrates that on a majority of days and for a majority of currencies, Visa imposed and Capital

One charged exchange rates that fell outside of the daily range of wholesale currency market rates

on the applicable processing date.[10]

---

[10] *See* Visa Currency Exchange Calculator, *available at*
https://usa.visa.com/support/consumer/travel-support/exchange-rate-calculator.html (*last accessed* July 1, 2021).

61.    For example, an analysis of the exchange rates applied by Visa to convert cardholder transactions from Euros to U.S. Dollars demonstrates that the rate imposed on consumers was higher than the range of rates available in the wholesale FX market for the applicable processing date on 94 percent of the dates for the period of September 2018 to August 2019. Visa's rates were within the range of rates available in the wholesale FX market on just 6 percent of those dates.

62.    Discovery will show that Visa's method for determining its rates is largely algorithmic, and that Visa's pattern of generating profits for itself by applying rates that are higher than those promised in cardholder contracts persisted throughout the relevant period, across currency pairs. Each such instance of Capital One charging rates outside the rates it promised its cardholders in its contracts injured Plaintiffs and Class Members and imposed an "overcharge."

63.    The extent of the overcharge for each Plaintiff and Class Member Visa card transaction can be calculated using transactional data in the possession, custody, or control of Capital One and Visa; historical Visa rates from Visa's website; and historical wholesale FX market data from third-party providers. Any transactions that were not subject to an overcharge—including transactions that took place on the limited number of dates for which Visa applied an exchange rate that was within the range of rates available in wholesale FX market—can be easily identified from those data sets and excluded.

64.    Similarly, contrary to the requirements set forth in the Capital One Credit Card Agreements for Mastercard-branded payment cards, Mastercard does not in fact apply its currency conversion procedures for credit card transactions as set forth in the Mastercard Rules. Contrary to the terms of Capital One's Deposit Account Agreements, Mastercard does not in fact apply government-mandated currency rates or a wholesale rates for transactions on Mastercard-branded

debit card transactions as required by the Mastercard Rules detailed below. Instead, Mastercard imposes, and Capital One charges, rates that are—for most currencies and on most dates—entirely outside of the range of wholesale market rates in a direction that is disadvantageous for the cardholders and advantageous for Mastercard and Capital One. This practice enables Mastercard and Capital One to profit from overcharging cardholders in violation of the Mastercard Rules and the Capital One Cardholder Agreements.

65.    An analysis of Mastercard's publicly available historical exchange rates that it has applied to foreign payment card transactions demonstrates that on a large portion of days and for many heavily traded currencies, Mastercard imposed and Capital One charged exchange rates that were not in fact wholesale currency market rates.[11]

66.    For example, an analysis of the exchange rates applied by Mastercard to convert Euros to U.S. Dollars ("EUR/USD") to the band of rates available in the wholesale FX market for the corresponding dates for the period of October 2017 to September 2018 shows that the exchange rates Mastercard applied to convert cardholder transactions from Euros to U.S. Dollars were higher than the range of rates available in the wholesale market on 41 percent of the dates for the period of October 2017 to September 2018. Mastercard's rates were at least within the range of rates available in the wholesale FX market on only 59 percent of those dates.

67.    Discovery will show that Mastercard's method for determining its rates is largely algorithmic, and that Mastercard's pattern of generating profits for itself and Capital One by applying rates that are higher than those promised in cardholder contracts persisted throughout the relevant period, across currency pairs. Each such instance of Capital One charging rates outside

---

[11] *See* Mastercard Currency Converter, https://www.mastercard.us/en-us/personal/get-support/convert-currency.html  (*last accessed* July 1, 2021).

the rates it promised its cardholders in its contracts injured Plaintiffs and Class Members and imposed an "overcharge."

68.    The extent of the overcharge for each Plaintiff and Class Member Mastercard transaction can be calculated using transactional data in the possession, custody, or control of Capital One and Mastercard; historical Mastercard rates from Mastercard's website; and historical wholesale FX market data from third-party providers such as Bloomberg and Reuters. Any transactions that were not subject to an overcharge—including transactions that took place on the dates for which Mastercard imposed an exchange rate that was a wholesale rate—can be easily identified from those data sets and excluded from Plaintiffs' damages calculations.

## CLASS ACTION ALLEGATIONS

69.    Plaintiffs assert their claims on behalf of the following Nationwide Class:

**Nationwide Class:** All persons or entities with a Visa or Mastercard payment card issued by Capital One who made a transaction in a foreign currency using such card within the applicable statute of limitations wherein the exchange rate imposed was not a government-mandated rate. Excluded from the Class are Defendants' executives, executives of Visa and Mastercard, and any Judge and judicial staff assigned to this case.

70.    Plaintiffs also allege the following alternative statewide subclasses (the "State Classes") in the event that the Court determines that any of the claims alleged on behalf of the proposed Nationwide Class are unsuitable for nationwide class treatment.

71.    Plaintiff Chakraborty also asserts his claims on behalf of the following Massachusetts Class:

**Massachusetts Class:** All persons or entities with a Visa or Mastercard payment card residing in Massachusetts issued by Capital One who made a transaction in a foreign currency using such card within the applicable statute of limitations wherein the exchange rate imposed was not a government-mandated rate. Excluded from the Class are Defendants' executives, executives of Visa or Mastercard, and any Judge and judicial staff assigned to this case.

72.     Plaintiff Wilson also asserts his claims on behalf of the following North Carolina Class:

> **North Carolina Class:** All persons or entities with a Visa or Mastercard payment card residing in North Carolina issued by Capital One who made a transaction in a foreign currency using such card within the applicable statute of limitations wherein the exchange rate imposed was not a government-mandated rate. Excluded from the Class are Defendants' executives, executives of Visa or Mastercard, and any Judge and judicial staff assigned to this case.

73.     Plaintiff Wright also asserts his claims on behalf of the following Washington Class:

> **Washington Class:** All persons or entities with a Visa or Mastercard payment card residing in Washington issued by Capital One who made a transaction in a foreign currency using such card within the applicable statute of limitations wherein the exchange rate imposed was not a government-mandated rate. Excluded from the Class are Defendants' executives, executives of Visa or Mastercard, and any Judge and judicial staff assigned to this case.

74.     This action is brought, and may properly be maintained, as a class action under Fed. R. Civ. P. 23.

75.     <u>Numerosity</u>: The Classes are so numerous that joinder of all Class Members is impracticable.

76.     <u>Typicality</u>: Plaintiffs' claims are typical of the Class Members' claims. Defendants treated Plaintiffs in the same manner as other Class Members and did not vary their FX practices from consumer to consumer.

77.     <u>Adequacy</u>: Plaintiffs will fairly and adequately protect the interests of the Classes, have no known conflicts with other Class Members, and have retained counsel experienced in complex class action litigation.

78.    <u>Commonality</u>: Common questions of law and fact exist as to all members of the Classes and predominate over any questions solely affecting individual members of the Classes. These common questions include:

a.    Whether Defendants breached their contracts with consumers by charging exchange rates not authorized by the contracts;

b.    Whether Defendants violated covenants of good faith and fair dealing in imposing exchange rates;

c.    Whether Defendants were unjustly enriched by their conduct;

d.    Whether Defendants' practices were deceptive, unconscionable, or unfair; and

e.    The proper measure of damages.

79.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Classes, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Classes as a whole.

80.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Classes predominate over any questions affecting only individual members of the Classes, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct described in this Complaint stems from common and uniform policies and practices. Members of the Classes do not have an interest in pursuing separate actions against Defendants, as the amount of each Class Member's individual claim is small compared to the expense and burden of individual prosecution. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial

efficiency, it would be desirable to concentrate the litigation of all Class Members' claims in a single forum.

81.     The running of any statute of limitations has been equitably tolled by reason of Defendants' fraudulent concealment and/or omissions of critical information regarding the exchanged rates imposed. Through its affirmative misrepresentations and omissions, Defendants actively concealed from Plaintiffs and Class Members that the exchange rates imposed were not a wholesale market rate and/or a rate reasonably related to Defendants' and the Processors' actual risk of exchanging foreign currencies. Discovery of Defendants' illegal conduct takes extensive data analysis of foreign exchange data, some of which is not available without paying significant costs.

82.     As a result of Defendants' actions, Plaintiffs and Class Members were unaware, and could not have reasonably known or learned through reasonable diligence, that they had been overcharged as a direct and proximate result of Defendants' and the Processors' acts and omissions.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Breach of Contract
### (On Behalf of All Plaintiffs and Proposed Nationwide Class against Capital One)

83.     Plaintiffs incorporate each allegation above as if fully set forth herein.

84.     Plaintiffs and members of the Nationwide Class entered into contracts with Capital One that required that the currency conversion rates applied to cardholder foreign currency transactions would be either wholesale FX market rates or a government-mandated rate.

85.     As alleged above, for a substantial percentage of all cardholder transactions during the relevant period, the currency conversion rates applied by Capital One to cardholder foreign

currency transactions were not in fact either wholesale FX market rates or a government-mandated rate. Instead, the rates imposed were higher than those available in wholesale markets on the relevant dates.

86.    In imposing such rates, Capital One breached their Cardholder Agreements with Plaintiffs and members of the Nationwide Class.

87.    As a result of Capital One's breaches of the Cardholder Agreements, Plaintiffs and members of the Nationwide Class were damaged in the form of overcharges on foreign currency payment card transactions that they otherwise would not have incurred in the absence of Capital One's unlawful conduct.

**SECOND CLAIM FOR RELIEF**
**Contractual Breach of the Implied Covenant of Good Faith and Fair Dealing**
**(On Behalf of All Plaintiffs and Proposed Nationwide Class against Capital One)**

88.    Plaintiffs incorporate each allegation above as if fully set forth herein.

89.    Capital One's Cardholder Agreements created the objectively justified expectation that the rates applied for foreign currency exchange would bear some resemblance to rates actually paid by Capital One and/or the Processors on the applicable date.

90.    Capital One's Cardholder Agreements created the objectively justified expectation in cardholders that the spread between the rates imposed on foreign currency exchanges in different directions on the same day would bear a reasonable relationship to the bid/ask spread experienced by participants in the FX wholesale market. Consumers reasonably expected that rates would not be imposed for the sole purpose of maximizing Capital One's and the Processors' profits, without regard to what normal wholesale market conditions would produce.

91.    Further, Defendants and the Processors benefitted from imposing such FX rates without assuming any corresponding risk because the transactions were being settled in U.S.

Dollars, with currency obtained through other contemporaneous transactions, and/or with currency that had been purchased on the FX futures market. Defendants' conduct here was charging FX exchange rates for the sole purpose of maximizing Defendants' and the Processors' profits rather than being authorized by the Cardholder Agreements, or bearing any reasonable relationship to the corresponding risk of fluctuation in the foreign exchange markets. The contractual language dictated by the Processors and used by Defendants did not disclose that Defendants and the Processors would impose rates beyond those allowed by the Cardholder Agreements.

92.    In light of its position with respect to consumers and the representations in its Agreements, Capital One had an obligation to ensure that the rates paid by its cardholders were imposed in good faith, and that the rates were not imposed for the sole purpose of maximizing Defendants' and the Processors' profits. This is particularly so where, in many instances, Capital One and the Processors were benefitting from the rates without assuming *any* corresponding risk whatsoever because the transactions were being settled in U.S. Dollars, with currency obtained through other contemporaneous transactions, and/or with currency that had been purchased on the FX futures market.

93.    As alleged above, for a substantial percentage of all cardholder transactions during the relevant period, Capital One applied currency conversion rates to cardholder foreign currency transactions in bad faith at the extreme ends of fictional daily bid-ask ranges of wholesale FX market rates such that Plaintiffs and members of the Nationwide Class were injured in the form of overcharges on FX payment card transactions.

94.    Capital One's practices described herein breached its duties of good faith and fair dealing in the performance and execution of the Cardholder Agreements, with Plaintiffs and members of the Nationwide Class.

95.     As a result of Capital One's breaches of the duties of good faith and fair dealing, Plaintiffs and members of the Nationwide Class were damaged in the form of overcharges on foreign currency payment card transactions that they otherwise would not have incurred in the absence of Capital One's unlawful conduct.

**THIRD CLAIM FOR RELIEF**
**Violations of the Massachusetts Consumer Protection Act**
**Mass. Gen. Laws ch. 93A, §1 et seq.**
**(On Behalf of Plaintiff Chakraborty and Proposed Massachusetts Class)**

96.     Plaintiff Chakraborty incorporates each allegation above as if fully set forth herein.

97.     Defendants' conduct alleged herein constitutes "unfair or deceptive acts or practices" in violation of Mass. Gen. Laws Ann. ch. 93A, § 2.

98.     Defendants have been engaged in trade or commerce as defined by Chapter 93A throughout the relevant period.

99.     Defendants' conduct here was unfair and deceptive and Defendants made false promises and concealed or omitted material facts. Defendants, Mastercard, and Visa imposed FX exchange rates for the sole purpose of maximizing Defendants', Mastercard's, and Visa's profits rather than being authorized by the Cardholder Agreements, or bearing any reasonable relationship to the corresponding risk of fluctuation in the foreign exchanges markets. The contractual language dictated by Visa and Mastercard and used by Defendants did not disclose that Defendants, Mastercard, and Visa would impose rates beyond those allowed by the Agreements.

100.    Defendants' Cardholder Agreements, and the debtor/creditor nature of the relationship with Plaintiff and the Massachusetts Class Members also created the objectively justified expectation that the spread between the rates imposed on foreign currency exchanges in different directions on the same day would bear a reasonable relationship to the bid/ask spread experienced by participants in the FX wholesale market. Consumers reasonably expected that rates

would not be imposed for the sole purpose of maximizing Capital One's, Mastercard's, and Visa's profits, without regard to what normal wholesale market conditions would produce.

101.    Further, Defendants, Mastercard, and Visa benefitted from imposing such FX rates without assuming any corresponding risk because the transactions were being settled in U.S. Dollars, with currency obtained through other contemporaneous transactions, and/or with currency that had been purchased on the FX futures market. As alleged above, for a substantial percentage of all cardholder transactions during the relevant period, the currency conversion rates applied by Capital One to cardholder foreign currency transactions were imposed at the extreme ends of the daily ranges wholesale FX market rates such that Plaintiff and members of the Massachusetts Class were injured in the form of overcharges on FX payment card transactions.

102.    Defendants' practice of applying overcharges to cardholder foreign currency transactions was continuous throughout at least the relevant period.

103.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Massachusetts Class have been injured in their business and property in that they incurred overcharges on foreign currency payment card transactions that they otherwise would not have incurred in the absence of Defendants' unlawful conduct.

104.    As a result of Defendants' violations of the Massachusetts Consumer Protection Act, Plaintiff Chakraborty and the Massachusetts Class seek all available damages, including treble damages, punitive damages, and attorneys' fees and costs.

105.    Capital One has been mailed or delivered a demand letter in accordance with Chapter 93A. More than thirty days has passed since such demand letter was mailed or delivered, and Capital One has failed to make a reasonable settlement offer in response.

**FOURTH CLAIM FOR RELIEF**
**Violations of the North Carolina Unfair Trade Practices Act ("NCUTPA")**

**N.C. Gen. Stat. § 75-1, *et seq.***
**(On Behalf of Plaintiff Wilson and Proposed North Carolina Class)**

106.    Plaintiff Wilson incorporates each allegation above as if fully set forth herein.

107.    Defendants' conduct alleged herein constitutes "unfair or deceptive acts or practices in or affecting commerce" in violation of N.C. Gen. Stat. § 75-1.1. This alleged conduct substantially affected commerce in the State of North Carolina and throughout the United States.

108.    Defendants' conduct here was unfair and deceptive and was inequitable assertion of their power. Defendants, Visa, and Mastercard imposed FX exchange rates for the sole purpose of maximizing Defendants', Visa's, and Mastercard's profits rather than being authorized by the Cardholder Agreements or bearing any reasonable relationship to the corresponding risk of fluctuation in the foreign exchange markets. The contractual language dictated by Mastercard and Visa and used by Defendants did not disclose that Defendants, Visa, and Mastercard would impose rates beyond those allowed by the Agreements.

109.    Defendants' Cardholder Agreements, and the debtor/creditor nature of the relationship with Plaintiff and the North Carolina Class also created the objectively justified expectation that the spread between the rates imposed on foreign currency exchanges in different directions on the same day would bear a reasonable relationship to the bid/ask spread experienced by participants in the FX wholesale market. Consumers reasonably expected that rates would not be imposed for the sole purpose of maximizing Capital One's and the Processors' profits, without regard to what normal wholesale market conditions would produce.

110.    Further, Defendants and Visa and Mastercard benefitted from imposing such FX rates without assuming any corresponding risk because the transactions were being settled in U.S. Dollars, with currency obtained through other contemporaneous transactions, and/or with currency that had been purchased on the FX futures market. Defendants' conduct here was deceptive and

Defendants made false promises and concealed or omitted material facts. Defendants imposed FX exchange rates for the sole purpose of maximizing Defendants', Visa's and Mastercard's profits rather than being authorized by the Cardholder Agreements or bearing any reasonable relationship to the corresponding risk of fluctuation in the foreign exchanges markets. The contractual language dictated by the Visa and Mastercard and used by Defendants did not disclose that Defendants and Visa and Mastercard would impose rates beyond those allowed by the contract.

111.    As alleged above, for a substantial percentage of all cardholder transactions during the relevant period, the currency conversion rates applied by Capital One to cardholder foreign currency transactions were imposed at the extreme ends of the daily ranges wholesale FX market rates such that Plaintiff and members of the North Carolina Class were injured in the form of overcharges on FX payment card transactions.

112.    Defendants' practices of applying overcharges to cardholder foreign currency transactions was continuous throughout at least the relevant period.

113.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the North Carolina Class have been injured in their business and property in that they incurred overcharges on foreign currency payment card transactions that they otherwise would not have incurred in the absence of Defendants' unlawful conduct.

114.    As a result of Defendants' violations of the North Carolina Unfair Trade Practice Act, Plaintiff Wilson and members of the North Carolina Class seek treble damages, plus reasonable attorney's fees and court costs, pursuant to N.C. Gen. Stat. § 75-16.

**FIFTH CLAIM FOR RELIEF**
**Violations of the Washington Consumer Protection Act**
**RCW § 19.86, *et seq*.**
**(On Behalf of Plaintiff Wright and Proposed Washington Class)**

115.    Plaintiff Wright incorporates each allegation above as if fully set forth herein.

116.    Defendants' conduct alleged herein constitutes "unfair or deceptive acts or practices" in violation of RCW § 19.86.202.

117.    Defendants have been engaged in trade or commerce throughout the relevant period.

118.    Defendants' conduct here was unfair and deceptive and Defendants made false promises and concealed or omitted material facts. Defendants, Mastercard, and Visa imposed FX exchange rates for the sole purpose of maximizing Defendants', Mastercard's, and Visa's profits rather than being authorized by the Cardholder Agreements or bearing any reasonable relationship to the corresponding risk of fluctuation in the foreign exchange markets. The contractual language dictated by Visa and Mastercard and used by Defendants did not disclose that Defendants, Mastercard, and Visa would impose rates beyond those allowed by the Agreements.

119.    Defendants' Cardholder Agreements and the debtor/creditor nature of the relationship with Plaintiff and the Washington Class also created the objectively justified expectation that the spread between the rates imposed on foreign currency exchanges in different directions on the same day would bear a reasonable relationship to the bid/ask spread experienced by participants in the FX wholesale market. Consumers reasonably expected that rates would not be imposed for the sole purpose of maximizing Capital One's, Mastercard's, and Visa's profits, without regard to what normal wholesale market conditions would produce.

120.    Further, Defendants, Mastercard, and Visa benefitted from imposing such FX rates without assuming any corresponding risk because the transactions were being settled in U.S. Dollars, with currency obtained through other contemporaneous transactions, and/or with currency that had been purchased on the FX futures market. As alleged above, for a substantial percentage of all cardholder transactions during the relevant period, the currency conversion rates applied by

Capital One to cardholder foreign currency transactions were imposed at the extreme ends of the daily ranges wholesale FX market rates such that Plaintiff and members of the Washington Class were injured in the form of overcharges on FX payment card transactions.

121.    Defendants' practices of applying overcharges to cardholder foreign currency transactions was continuous throughout at least the relevant period.

122.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Washington Class have been injured in their business and property in that they incurred overcharges on foreign currency payment card transactions that they otherwise would not have incurred in the absence of Defendants' unlawful conduct.

123.    As a result of Defendants' violations of the Washington Consumer Protection Act, Plaintiff Wright and the Washington Class seek all available damages, including treble damages, punitive damages, and attorneys' fees and costs.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Classes, ask for judgment against Defendants as follows:

a.    Certification of this action as a class action on behalf of the proposed Classes;

b.    Designation of Plaintiffs as Class Representatives;

c.    Appointment of undersigned counsel as Class counsel;

d.    Judgment in favor of Plaintiffs on all causes of action;

e.    Declaration that the practices complained of herein are unlawful;

f.    Injunction requiring Defendants to cease and desist from engaging in the unlawful practices alleged herein;

g.    Damages in the form of all money improperly collected or received by Defendants;

    h.   Disgorgement of all amounts improperly collected or received by Defendants;

    i.   An award of pre-judgment and post-judgment interest as provided by law;

    j.   An award of attorneys' fees and costs; and

    k.   Any further remedy the Court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demand a trial by jury on all claims so triable.

Date:

/s/ _____
Kristi C. Kelly, VSB #72791
Email: kkelly@kellyguzzo.com
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, Virginia 22030
Telephone: (703) 424-7572
Facsimile: (703) 591-0167

Eric L. Cramer*
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
T. 215.875.3009
F. 215.875.4604
ecramer@bm.net

E. Michelle Drake*
BERGER MONTAGUE PC
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
T. 612.594.5933
F. 612.584.4470
emdrake@bm.net
*pro hac vice forthcoming

*Counsel for Plaintiffs*
