1

```
                    UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF VIRGINIA
2                        Alexandria Division

3

   EMILY WRIGHT, TIFFANY WILSON,    :
4  KRISHNENDU CHAKRABORTY, and      :    Civil Case Number
   MICHAEL BROFMAN,                 :    1:21-CV-00803-TSE-IDD
5  On behalf of themselves and      :
   all others similarly situated,   :
6                                   :    December 9, 2021
                                    :    4:55 p.m.
                       Plaintiffs,  :
7                                   :
                                    :
          v.                        :
8                                   :
   CAPITAL ONE BANK (USA) N.A.,     :
9  and CAPITAL ONE, N.A.,           :
                       Defendants   :
10 ...........................      :    ........................
```

11
```
                     TRANSCRIPT OF MOTION HEARING
                 BEFORE THE HONORABLE T.S. ELLIS, III
12                   UNITED STATES DISTRICT JUDGE
```

13  <u>APPEARANCES:</u>

14    FOR THE PLAINTIFFS:       ELEANOR MICHELLE DRAKE
                                  BERGER MONTAGUE, PC
15                                    1229 Tyler Street NE
                                  Suite 205
16                                    Minneapolis, MN  55413
                                  612-594-5933

17

18                                    KRISTI CAHOON KELLY
                                  KELLY GUZZO, PLC
19                                    3925 Chain Bridge Road
                                  Suite 202
20                                    Fairfax, VA  22030
                                  703-424-7570

21    FOR THE DEFENDANTS:       JOHN S. MORAN
                                  McGUIRE WOODS, LLP
22                                    888 16th Street, NW
                                  Suite 500
23                                    Black Lives Matter Plaza
                                  Washington, DC  20006
24                                    202-857-1700

25                                    (APPEARANCES CONTINUED ON
FOLLOWING PAGE)

```
1
         FOR THE DEFENDANTS:          KATHERINE ELIZABETH LEHNEN
2                                     McGUIRE WOODS, LLP
                                      Gateway Plaza
3                                     800 East Canal Street
                                      Richmond, VA  23219
4                                     804-775-7887

5
         OFFICIAL COURT REPORTER:     REBECCA STONESTREET, RPR, CRR
6                                     U.S. District Court, 9th Floor
                                      401 Courthouse Square
7                                     Alexandria, Virginia  22314
                                      (240) 426-7767
8

9                           ( Pages 1 - 54)

10

11           COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**P R O C E E D I N G S**

1         COURTROOM CLERK:  Court calls civil case

2 Emily Wright, et al. versus Capital One Bank USA, NA, et al.,

3 Case Number 2021-CV-803.  May I have appearances, please, first

4 for the plaintiff.

5         MS. DRAKE:  Good afternoon, Your Honor.  Michelle Drake

6 on behalf of the plaintiff.

7         THE COURT:  Can you come to the podium, please.  And

8 you may, if you're comfortable doing so, remove your mask

9 because you're behind a shield there and it's easier for the

10 court reporter to understand you.  So let me have your

11 appearances at the podium, please, with your mask removed,

12 unless you're not comfortable doing so.

13         MS. DRAKE:  I'm anxious to leave it on, Your Honor, if

14 the court reporter is able to understand me.

15         THE COURT:  I think you're doing all right.  Yes, you

16 may do so.

17         MS. DRAKE:  Than you, Your Honor.  Michelle Drake on

18 behalf of plaintiffs.  And with me today is my colleague,

19 Kristi Kelly.

20         THE COURT:  All right.  Thank you.

21         And for the defendant?

22         MR. MORAN:  Good afternoon, Your Honor.  John Moran for

23 the defendants.  And with me is my colleague, Katie Lehnen.

24         THE COURT:  Good afternoon to both of you.  This matter

1    is before the Court on a motion to dismiss.  I have reasonable

2    familiarity with your briefs.  You're moving to dismiss not only

3    on 12(b)(6), but also on standing with respect to a part of it.

4         I have a number of questions.  Mr. Moran, let's begin

5    with you.  You're the movant.

6         MR. MORAN:  Yes, Your Honor.

7         THE COURT:  Am I correct that the crux of the claim by

8    the class is that Capital One, in its issuance of a credit

9    card - either Visa or MasterCard, probably - uses an exchange

10   rate that's disadvantageous?  In other words, in the old days,

11   if you arrived at an airport in Europe, the first thing you

12   would do is you would see where you could get local currency,

13   before the Euro and all that stuff, and you would see the

14   exchange rates fluctuate over time.  And the plaintiffs in this

15   case, the class of plaintiffs, argue that Capital One Master and

16   Visa use an exchange rate that's advantageous to them but not to

17   the cardholder.  Is that kind of the gist of it?

18        MR. MORAN:  Yes, Your Honor.  Not to speak for

19   plaintiffs themselves, but I think you've got to the heart of

20   the matter.  The central allegation is whether the foreign

21   exchange rates that are applied to foreign transactions by

22   cardholders exceed a contractually required rate.

23        THE COURT:  All right.  Now, the contractually required

24   rate, in your view, you don't set it.  Visa and MasterCard do.

25   And so you argue in 12(b)(6) that you don't have any contract

1    with these people as to -- that is, this class, as to what rate

2    to use.

3          MR. MORAN:  Correct, Your Honor.  To be clear, there's

4    no dispute that there is a contract between --

5          THE COURT:  That's right.

6          MR. MORAN:  -- Capital One as the defendants, and the

7    plaintiffs.  The question is whether that contract contains a

8    term that specifies a particular rate will be applied when a

9    foreign transaction occurs.

10         THE COURT:  And your position is it doesn't, just that

11   Visa and MasterCard are going to do it?

12         MR. MORAN:  That's correct.  And I would point the

13   Court to the specific language --

14         THE COURT:  Yes, you can in a minute.  I want to get

15   these preliminary matters out of the way and then I'll let you

16   argue further.

17         Now, another point that you've made in the briefing is

18   that the named plaintiffs don't have standing with respect to

19   debit cards, only credit cards.  And there's a different

20   contract, and so they don't have standing.  Is that correct?

21         MR. MORAN:  That's correct, Your Honor.

22         THE COURT:  And what's the argument that the plaintiff

23   makes against that?

24         MR. MORAN:  So as I understand plaintiff's argument, it

25   is, in short, that the real question, as they see it, is whether

1    their named plaintiffs, who are credit card holders, can

2    represent debit card holders in the class action that they

3    intend to bring if they survive the motion to dismiss and move

4    for class certification.

5           THE COURT:  All right.

6           MR. MORAN:  And we view it slightly differently.

7    Because what we have before the Court today is a complaint that

8    is brought, for now, on behalf of individual plaintiffs.  It

9    contains allegations about what Capital One does with its debit

10   cards, and it seeks relief that would include injunctive relief

11   related to credit cards.

12          And our position, and we think it's supported by the

13   law, is that in order to bring those claims for now --

14          THE COURT:  All right.

15          MR. MORAN:  -- they need to show Article III standing.

16          THE COURT:  Yes, I'll let you say more about that.  The

17   final point I wanted to cover, I was amused to see that the

18   plaintiffs define a class in a way that excludes judicial

19   officers.  And it got me to thinking and reminiscing -- I'm an

20   old man and so I reminisce a lot.  Many years ago, when your

21   firm was still McGuire Woods Battle & Boothe, I lived in

22   Richmond, practiced in Richmond with a then larger firm.  And we

23   appeared -- we represented PEPCO, and we appeared in a case and

24   Judge Merhige was the presiding judge, whom I succeeded when he

25   took senior status in the mid '80s, 1980's.  Some would argue it

7

1  might be 1880, but that's not true.  I am old but not that old.

2  Anyway, that was resolved because all judges had PEPCO.  Some

3  judges did recuse themselves.  But now the plaintiff has defined

4  it to exclude judicial officers.

5       Let me ask you, has there ever been a case that's

6  questioned the proprietary or legitimacy of defining a class to

7  exclude judicial officers to avoid the problem of a conflict?

8       MR. MORAN:  Well, I'll confess, Your Honor, that I

9  haven't looked specifically into that question, I think in part

10  because our view is that all that's before the Court today is a

11  complaint brought on behalf of individual plaintiffs.  Now, of

12  course --

13       THE COURT:  So you think I don't even need to reach it

14  because of what's before the Court today.

15       Well, it's now a common provision in these class

16  actions, to exclude judicial officers, which I find a bit

17  amusing.  I'm not sure it's always appropriate or legitimate,

18  but I don't see a problem here.  I take it you don't either?

19       MR. MORAN:  Not necessarily.  Your Honor, to think out

20  loud just briefly, I think if there were a material likelihood

21  of damages being awarded, then, you know, I think a judge who is

22  carved out doesn't necessarily have skin in the game.  If there

23  were injunctive relief that were directly at issue, it might

24  affect that judge.

25       But again, at least for now, my sense is that we

1    have --

2         THE COURT:  Well, all of this is prompted by the fact

3    that I have Visa cards, my wife has Visa and Master, I have Visa

4    and Master, and my wife has a Capital One card.  I don't know

5    whether it's Visa or Master or something else.  But she has one.

6    I don't.  So that's why I wanted to look carefully at that.

7         But I think your view is that the real focus here

8    should be on Visa and Master because they're the ones who

9    determine what exchange rate to use?

10        MR. MORAN:  Well, that's our substantive point,

11   Your Honor.  And maybe the last thing I'll say --

12        THE COURT:  -- doesn't have a conflict there.

13        MR. MORAN:  Well, I guess the last thing I would say

14   is, if Your Honor would appreciate additional briefing on it,

15   we're happy to look at it.  But we haven't come prepared today

16   to weight in on that.

17        THE COURT:  No, that's not necessary.  But you don't

18   seek my recusal and neither do the plaintiffs?

19        MR. MORAN:  We are certainly not requesting it,

20   Your Honor.

21        THE COURT:  And is that true also of the plaintiffs,

22   Ms. Drake?

23        MS. DRAKE:  It is, Your Honor.

24        THE COURT:  I think that's sufficient preliminary

25   matters.  I think I have a view generally.  Now, if you want to

1    go into detail, Mr. Moran, and tell me why you think the

2    provisions in the contract with Capital One credit cards don't

3    lead to any liability, given the allegations here.

4            So go ahead and address the two main issues.

5            MR. MORAN:  Sure.  And I agree that those are the two

6    main issues here.  And to go a little bit backwards, I think

7    I'll get to the language of the contracts in a moment.  But I

8    think before doing that, I would like to point out that one of

9    the key questions here is the existence of a promise on behalf

10   of Capital One, but the natural question that goes along with

11   that is, if there is a promise, what are its terms?  What is it

12   that Capital One is alleged to have promised?

13           In their opposition, plaintiffs claim that their

14   complaint, quote, identifies specific promises within the

15   cardholder agreements which, quote, detail the specific

16   procedures that Capital One promised the processors would use in

17   selecting FX rates for payment cardholders' foreign

18   transactions.  So the center of their response to the motion to

19   dismiss is that the contracts have specific promises that detail

20   the precise procedures that will be applied.

21           And at least in my view, if the contract did contain

22   such a promise and did specify such detailed procedures, then

23   there are a number of questions that it would address, such as,

24   how does each network calculate the FX rate that's going to

25   apply when a foreign transaction is conducted?  What is meant by

1    a wholesale exchange rate, and how is that rate supposed to be

2    selected?  If the wholesale exchange rate is not a single fixed

3    rate, how do the networks choose among the available options for

4    any given transaction?  And if - and this is to quote the

5    processor rules - if a network starts with or uses a wholesale

6    rate, what else are they supposed to do after they've started,

7    or how do they use it?

8         So if Capital One had made a promise to cardholders

9    about the FX rates that would be used and about the procedures

10   that would be followed, I think you could reasonably expect

11   these questions to be answered.

12        So then we look at the agreements in question.  And the

13   first is the credit card agreement, and that's the one that we

14   think is most squarely at issue because the named plaintiffs are

15   credit card holders.  We've included this as Exhibit A.  It's

16   ECF 28-1.  And this is on page 9 at least of the PDF that you

17   get when you look up 28-1.  And under a heading of "Transactions

18   Made in Foreign Currencies," the agreement says:  "If you make a

19   transaction in a foreign currency, the Payment Card Network" -

20   that is, Visa or MasterCard - "will convert it into a

21   U.S. dollar amount.  The Payment Card Network will use its own

22   currency conversion procedures.  The conversion rate in effect

23   on the processing date may differ from the rate in effect on the

24   transaction date that appears on your statement.  We do not

25   adjust the currency exchange rate or charge any currency

1    conversion fees."  And that's the end of the provision.

2         And our simple contention is that nothing in that

3    paragraph says that customers are entitled to a specific rate,

4    that Capital One will take steps to guarantee that they get a

5    particular rate, or that the networks will process those

6    transactions or select their rates in any particular way.  The

7    closest it comes is to say that the Payment Card Network will

8    use its own currency conversion procedures.

9         And this is the hook that plaintiffs try to use to say

10   that by saying that Visa and MasterCard will use their own

11   procedures, Capital One is incorporating by reference the rules

12   that those networks have adopted, and is promising or

13   guaranteeing that no matter what, Capital One is going to take

14   steps to make sure that they get that rate.  And with respect,

15   we think you frankly can't get that juice with that squeeze,

16   that that's not what the provision says.

17        THE COURT:  Get that juice by that squeeze.  That's a

18   new one on me.  I'm all in favor of metaphors and similes.  That

19   one, I like that.  Can't get juice from that squeeze.

20        MR. MORAN:  I was debating whether to retract it,

21   Your Honor.

22        THE COURT:  No, don't retract it.  Metaphors and

23   similes are the fuel with which we think and reach conclusions.

24   The more often we use them, the better.  That one doesn't help a

25   whole lot, but it is humorous, and that's a plus these days.

1          MR. MORAN:  I will take it.

2          And again, Your Honor, with respect to the debit card

3    agreements, we argue that those aren't relevant.  But because

4    plaintiffs have relied on them in their argument, I would like

5    to address those as well.

6          THE COURT:  Well, before you go on, tell me once again

7    why you think their argument that the incorporation -- they

8    argue that by saying that the Visa and Master are going to use

9    their procedures and a foreign exchange rate, they say that

10   incorporates what Visa and MasterCard do in the Capital card.

11   Right?

12         MR. MORAN:  That's their position, yes, Your Honor.

13         THE COURT:  And tell me once again, without the juice

14   and the squeeze, why you think that argument fails.

15         MR. MORAN:  Sure.  Well, I think at a most basic level,

16   Your Honor, there are two reasons it fails.  One, it's not

17   enough to mention -- so first of all, the rules themselves are

18   not incorporated by reference.  The closest that we come is the

19   statement that the Payment Card Network, quote, "will use its

20   own currency conversion procedures."

21         Now, they construe that to mean that they will follow

22   the capital "R" Rules which are published.  And I'm not saying

23   it's unfair to connect the procedures with the Rules, but it's

24   not as if a specific document here is being incorporated by

25   reference.

1          But I think under Virginia law and the cases that we've

2     cited, the more important note is that there's nothing

3     promissory there about the language.  And the mere fact that

4     Capital One recites in its agreement that the networks will use

5     their own currency conversion procedures is not sufficient,

6     under Virginia law, in our view, to create an enforceable and

7     binding promise.  And I think the two cases that help to

8     illustrate that principle most clearly would be *Utica Mutual*

9     *Insurance Company* and *Smith vs. Farrell*.

10         So in *Utica Mutual Insurance Company*, there was a

11    rental of construction equipment or industrial equipment of some

12    sort, and the boom pump operator -- as an aside, my 4-year-old

13    son loves boom pumps, so we watch a lot about them.  It said the

14    boom pump could not operate to within 17 feet of an electric

15    line.  And so this was -- the company that was renting the boom

16    and supplying the operator to a larger construction site said in

17    what was labeled the Agreement that they could not operate a

18    boom pump within 17 feet of an electrical line.  Well, in that

19    particular case, the boom pump was operated within 17 feet of an

20    electrical line, and damage ensued that led to the suit at

21    issue.

22         And what the court said in *Utica Mutual Insurance*

23    *Company* is that by indicating that the boom could not operate

24    within 7 [sic] feet of an electrical line, the rental company

25    was not making a promise that their operator would not move it

1    within 17 feet of an electrical line; they were merely

2    disclosing to the renter that that was a limitation on the

3    equipment, and that it shouldn't be operated within 17 feet of

4    an electrical line.  Because in reality, the party that rented

5    the boom was ultimately in charge of how that construction site

6    was going to be run, and so they could not turn around and sue

7    the renter for that language.

8          And so what that establishes and illustrates is that

9    agreements often contain declarative statements that are not

10   intended as contractual promises.  They don't have the

11   indicative language of, you know, "shall" or "agree" that

12   indicate that the party is making a promise.  They're merely

13   disclosures about how the parties expect things to go.  And

14   *Smith vs. Farrell* is of a piece with that.

15         In *Smith vs. Farrell*, the parties were negotiating over

16   the sale of homes that were to be built on a large tract of land

17   in Maryland, and in the course of this discussion, the builder

18   represented that they intended to build thousands of houses on

19   the property, and that the plaintiff in the case would have the

20   right, the exclusive right, to market the first 1,500 houses

21   that were built in that way.

22         Well, as things turned out, they only built three or

23   four houses, and the plaintiff sued saying, in the course of

24   this negotiation, you promised us that you would build at least

25   1,500 houses.  And what the court said is, no; in fact, there

1   was no such promise.  Yes, in the course of the discussions the

2   defendant said that they intended -- that they would, that they

3   would build more than 1,500 houses, but just because they

4   disclosed that expectation, and just because the parties both

5   relied on that as part of the reason why they wanted to enter

6   into the contract, didn't mean that building 1,500 houses became

7   an enforceable contract.

8        And I guess the one other case I would point to - and

9   it's not a Virginia case but I think it illustrates this

10  principle nicely as well - is *United States vs. Hamdi*, a

11  decision from 2005, the Second Circuit Court of Appeals, in an

12  opinion authored by then Judge Sonia Sotomayor.  And there it

13  was not a commercial contract, it was a plea agreement between

14  the United States and the criminal defendant, and it included

15  recitations about what the parties expected to happen during the

16  sentencing.  And what Justice - then Judge - Sotomayor noted is

17  that, quote, "parts of the agreement simply cannot be

18  interpreted as covenants or promises to perform because they are

19  beyond the power of either party to promise."

20       And again, if you look at it, it's a declarative

21  statement that's contained in what's indisputably an agreement,

22  but the mere fact that a future expectation was recited in the

23  agreement did not amount to an enforceable contractual promise.

24       So that's a long-winded way, Your Honor, of getting to

25  your question, which is, why do we think that the statement in

1   the agreement that, quote, "the Payment Card Network will use

2   its own currency conversion procedures," is not an enforceable

3   promise?  It's not a guarantee by Capital One that they will

4   take some undisclosed affirmative steps to assure that the rate

5   is a particular type of rate or that it's processed in a

6   particular way, it's merely a disclosure to the customer - and

7   now the plaintiff - of how this whole thing is going to work.

8           And again, I indicated that despite the standing issue

9   we've raised, plaintiffs have looked at the deposit agreement,

10  and we think in some ways that language makes this issue even

11  more stark.  So here's the language from the deposit account

12  agreement.  This is ECF 28-2, and this is on page 38 of the PDF,

13  as we have it:  "Transactions made with your card in foreign

14  currencies, and transactions that are classified by MasterCard

15  as cross border transactions (generally, transactions that are

16  processed outside the United States) are called," quote,

17  'foreign transactions,'" end quote.  "If a foreign transaction

18  is in a foreign currency, it will be posted to your account in

19  U.S. dollars.  The exchange rate between the foreign currency

20  and U.S. dollars is a rate selected by MasterCard.  Basically

21  here's how MasterCard calculates the exchange rate.  They

22  usually start with either a government mandated currency rate or

23  a wholesale rate as of the day your foreign transaction is

24  processed; i.e., not the date you made your purchase and not the

25  date your purchase is posted on the statement."

1          And that's the end of the provision.  And we submit

2     that it's rather curious, if Capital One were promising a

3     particular -- a specific set of procedures, as plaintiffs

4     claimed in their opposition, that you would find language like,

5     basically, this is how it works, or they usually start with one

6     of these two types of rates.  And we think that language just

7     further illustrates that what this language is trying to do is

8     to inform and educate the customer about how these things work,

9     but is not making a contractually binding promise to perform.

10          And so that's the central piece of our contention.  I

11    think if we go to the state unfair trade transaction claims,

12    there's an even higher burden of pleading with particularity.

13    And the reason that's especially relevant is because as

14    Your Honor said at the outset, I think it's fair to say that the

15    basic argument that plaintiffs make is that they are entitled to

16    a, quote, "wholesale exchange rate," end quote, and that what

17    they received is not a, quote, "wholesale exchange rate," end

18    quote.

19          Now, you know, as we point out, the contract doesn't

20    define what that means.  And there are lots of different things

21    that somebody could think about what that means.  But that's not

22    the only theory that's alleged in the complaint.  They allege in

23    the complaint that the agreements, quote, "created the

24    objectively justified expectation that the rates applied for

25    foreign currency transactions would bear some resemblance to

1   rates actually paid by Capital One and/or the processors on the

2   applicable date."  And that's the complaint at Paragraph 89.

3          Now, an allegation that the rates that were charged

4   don't bear some resemblance to rates actually paid is very

5   different from an allegation that the rates don't meet some

6   contractual definition of wholesale exchange rate.  In

7   Paragraph 14 they allege that the rates, quote, "bear no

8   resemblance to any exchange rate obtained, or that could be

9   obtained in wholesale markets," end quote.  Now, that at least

10  relates to things going on in wholesale markets, but it doesn't

11  connect back to why that would meet some contractual definition

12  of wholesale exchange rates.

13         In Paragraph 15, they allege that the rates were

14  improper because they did not, quote, "approximate," end quote,

15  the, quote, "actual costs of acquiring foreign currency to

16  settle transactions," end quote.  So now we've introduced a new

17  concept, that Capital One allegedly made a promise not only that

18  the rates charged would be wholesale exchange rates - which for

19  credit card customers is not a phrase that even appears in the

20  agreement, it appears in the processors' rules - but also that

21  those rates have to bear some relationship to the actual costs

22  of acquiring foreign currency.

23         Then, in Paragraph 90, they allege that the agreements,

24  quote, "created the objectively justified expectation in

25  cardholders that the spread between the rates would bear a

1    reasonable relationship to the bid/ask spread experienced by

2    participants this the FX wholesale market," end quote.

3         So now in Paragraph 9 to we have a new concept.  The

4    concept -- as Your Honor noted, when you went to the kiosk, you

5    got off the plane in Italy and you went to the kiosk, I'm sure

6    you noticed that the rate for changing dollars into *lira* was not

7    as good as the rate for changing *lira* into dollars, and there

8    was a bid and ask spread that the merchant who is changing the

9    money used to generate their profit.  And so now they've

10   introduced a new concept that the contract with credit card

11   customers, which says nothing about anything specific about how

12   this is done, also contains some sort of promise that the rates

13   charged would bear a reasonable relationship to the bid/ask

14   spread.

15        So what these and other allegations in the complaint

16   show, and why we think this is important particularly in the

17   light of the particularity pleading requirement under Rule 9(b)

18   for their unfair trade practice claims, is that Capital One has

19   a right to know, first of all, under the particularity pleading

20   standard, what theory they're alleged to have violated, why

21   these rates are allegedly wrong.  And that's a problem that's

22   exacerbated, because, as the pleadings make clear and as reality

23   is, Capital One is not the party who is doing these

24   transactions, and so it doesn't have the insight to re-create

25   for itself what theory of plaintiffs actually has traction.

 1          But, more importantly, even setting aside the

 2    particularity standard, we think that this multiplicity of

 3    theories just further shows that the language in the agreement

 4    is not a contractual promise because it can't bear the weight

 5    that plaintiffs try to put on it.  They try to say that it

 6    answers all of these subsidiary questions about how the rate is

 7    going to apply, what relationship is there going to be between

 8    the rate that's charged and the bid/ask spread, what's the

 9    relationship going to be between the rate that's charged and the

10    rates that are actually paid.  And some of these are even

11    potentially conflicting theories.

12          So, for example, if the contract required that the rate

13    has to be related to the rates actually paid, that might not be

14    the rate that's available on the wholesale exchange market,

15    because not every transaction is cleared through the wholesale

16    exchange market.  So even there we have conflicting theories.

17          And what we have in the complaint is a series of

18    allegations that, based on an analysis -- which is an analysis

19    that plaintiffs don't actually plead.  They don't disclose what

20    their analysis is, they just say in a conclusory manner that

21    based on their analysis, the rates that were charged exceed the

22    rates that were under the contract.  So again, as to this point

23    about particularity especially, we think Capital One is entitled

24    to know what rates the plaintiffs think they were supposed to be

25    charged, and why they think they were charged a rate that wasn't

1    fair.

2              But again, even setting aside that particularity

3    requirement, it all further goes to show that the contract

4    doesn't have such a promise in the first place.

5              THE COURT:  All right.  I think you've covered your

6    argument on the 12(b)(6).  Let's separate that from the standing

7    argument.  Let me hear from the plaintiff just on that issue,

8    and then we'll get to standing.  But since you have the burden,

9    you're the movant, I'll give you an opportunity to respond to

10   whatever Ms. Drake argues.

11             MR. MORAN:  Thank you.

12             THE COURT:  Ms. Drake, let me begin by asking a

13   different question, and then you can come back to addressing

14   what Mr. Moran has argued.  Why didn't you sue Capital One,

15   Visa, and MasterCard together?  Why are you suing Visa and

16   MasterCard in New York and this case here?

17             MS. DRAKE:  It's a fair question, Your Honor.

18             THE COURT:  Well, fairness is supposed to be a hallmark

19   of what I do.  So I'm glad you think it's a fair question.

20             MS. DRAKE:  I would say it's an excellent question.

21   And what I can tell the Court is that we had many internal

22   discussions about the propriety of how to structure these

23   lawsuits.  I don't want to get too far into our strategy

24   reasoning, but one thing I would note for the Court is that the

25   classes as pled in the Visa and MasterCard cases include banks

1    in addition to Capital One, because the procedures that the

2    processors use do not vary from bank to bank, and various banks'

3    agreements also do not vary.

4              So from a jurisdictional perspective, the safest place

5    to sue processors for conduct which encompasses customers of

6    multiple banks is likely in the processors' home jurisdictions,

7    not in the banks' home jurisdictions.  There could -- and I

8    don't want to go any further than this, so I'll raise just one

9    potential question.  Visa may have complained, for example,

10   about being sued in Virginia for conduct that related to a

11   Bank of America borrower, where Bank of America is headquartered

12   in North Carolina.

13             THE COURT:  What is your answer -- I think I've heard

14   part of it.  But what is your answer to the central point made

15   by the defendant that, look, we did not promise any specific

16   exchange rate, we said that the processors were going to do it,

17   and your beef is with the processors in that regard, not with

18   us.  Because we didn't promise any particular exchange rate or

19   any particular result from using an exchange rate.

20             MS. DRAKE:  We believe that in its agreements, its

21   self-termed agreements with its own cardholders, Capital One did

22   in fact make a promise about what its agents, its delegates, the

23   processors, would do.  And thinking about the credit card

24   agreement in particular, which states that the processors will

25   use their own procedures, that is an incorporation by reference

1    of the Visa rules and the MasterCard rules, to which Capital One

2    has agreed.  Those are public documents.

3           Saying that the processors will use the processors'

4    procedures for foreign currency conversion means something.  It

5    means something more and different than saying, for example,

6    Visa will convert your money however it feels like it.  That's

7    not what they said.  They said the processors will convert

8    according to the processors' procedures.

9           And we didn't just go out and hopefully figure out what

10   those procedures were.  They're in a published document that we

11   cite as to both MasterCard and Visa in Paragraphs 54 and 55 of

12   our complaint, where Visa and MasterCard publicly lay out

13   precisely what those procedures are.

14          And so when Capital One tells its customers, when you

15   engage in a foreign transaction with us, Visa and MasterCard are

16   going to apply their procedures, that means Visa and MasterCard

17   are going to apply the Visa and MasterCard rules to which

18   Capital One has agreed and that are published.  And I would

19   note --

20          THE COURT:  So if they're published and everyone had

21   notice of them, and they used them, where is the breach?

22          MS. DRAKE:  The issue is that Visa and MasterCard did

23   not abide by their published procedures.

24          THE COURT:  All right.

25          MS. DRAKE:  That's the briefs, Your Honor.

1          THE COURT:  All right.  Go on.

2          MS. DRAKE:  What I also wanted to say is that

3     Capital One, in the briefing, likes to make a big deal out of

4     the fact that Capital One says:  We do not adjust the rates that

5     are applied by the processors.  I view that language as harmful

6     to Capital One, because to me it undergirds the fact that

7     Capital One is promising a rate that will be determined

8     according to a particular procedure, that Capital One will not

9     then change.  Why would Capital One tell its customers, you are

10    going to get a rate developed according to a particular

11    procedure, we will not change that rate, if there was no rate

12    promised in the first instance?  It doesn't make any sense for

13    me to say, you're going to get some random thing and I'm not

14    going to change it.  It's not just some random thing.  Saying

15    Visa and MasterCard's procedures, it means something and it

16    means something definite.

17          You know, the Court chuckled at the phrase, "you can't

18    get the juice for the squeeze."  The phrase that comes to mind

19    for me with respect to foreign exchange rates is, this is not

20    rocket surgery, which is something that one of my partners likes

21    to say.

22          THE COURT:  Rocket surgery?  You're mixing your

23    metaphors there.

24          MS. DRAKE:  That's right.  That's why I think it's

25    funny, because it's neither rocket science nor brain surgery.

1              THE COURT:  Well, that doesn't communicate that.

2              MS. DRAKE:  Perhaps it was just a poor attempt at

3    humor, Your Honor.  I always chuckle when he says it.  I think

4    what he means is that, this isn't super complicated.  Like,

5    we're not doing brain surgery and we're not doing rocket

6    science.

7              And I think I feel the same way about the application

8    of foreign exchange rates.  Capital One made a lot of arguments

9    about, oh, if this was really an agreement about exchange rates,

10   and the Visa procedures and the MasterCard procedures were

11   binding, we would expect them to specify all these things.  But

12   the specification of an exchange rate is very simple.  What

13   cardholders were told is that they would receive a wholesale

14   market rate.  There isn't --

15             THE COURT:  Yeah, but where is that?

16             MS. DRAKE:  In Paragraphs 54 and 55 of the complaint.

17             THE COURT:  No, I know it's in your complaint.  Where

18   is it in the agreement?  The fact that you put it in the

19   complaint doesn't mean it's in an agreement.

20             MS. DRAKE:  So the credit card agreement is in

21   Paragraph 50.

22             THE COURT:  And where does it say, "We promise you a

23   wholesale rate"?

24             MS. DRAKE:  So the Capital One agreement states that

25   the Payment Card Network will use its own currency conversion

```
 1    procedures.  Those procedures are set out in the rules, to which

 2    I just referred, the Visa rules and the MasterCard rules, and

 3    the Visa rules and the MasterCard rules are in Paragraphs 54 and

 4    55.

 5            And so our view is that the language in each

 6    processor's published rules is what is incorporated into

 7    Capital One's agreements with its cardholders by reference.  And

 8    the rules, which we say are incorporated by reference, do

 9    specify a wholesale rate.

10            And the fact that Capital One knows that, Your Honor,

11    is demonstrated by the language in the deposit agreements which

12    defendant attached to its pleadings.  So, you know, they say,

13    for example --

14            THE COURT:  Well, I don't find it very significant that

15    Capital One knows what the rules are.  I don't find that

16    significant.  That's sort of like saying, well, we know that you

17    shouldn't use a boom that's more than 17 feet because you're

18    going to hit an electric line.  They knew that.

19            MS. DRAKE:  I think, Your Honor, the reason that it's

20    salient is because they included a description of those same

21    procedures in their debit card agreements when they said that

22    MasterCard starts with a wholesale rate.  That demonstrates that

23    what they were referring to when they said Visa and MasterCard's

24    processing procedures are the procedures that are set forth in

25    the published rules.
```

1          THE COURT:  All right.  Go ahead and finish your

2    argument, because then I want to get on to the standing

3    argument.

4          MS. DRAKE:  So I would like to say a couple of things.

5    On the question of whether the language at issue is contractual

6    in nature, or as defendant would frame it, it's just some

7    noncontractual disclosure about what a third party may or may

8    not do, I would commend two decisions, both involving this

9    defendant, to the Court.

10          The first is Judge Trenga's opinion in the *Capital One*

11    *Data Breach* case where Capital One made essentially the same

12    argument about its notice of its own privacy policies.  In that

13    case, Capital One also came to court and said, oh, that document

14    isn't a contract, that's just a notice about privacy policies.

15    And the language that Judge Trenga upheld as contractual in

16    nature was no more specific than the language here.

17          In that case, Judge Trenga found that plaintiffs had

18    stated a breach of contract claim based on a representation from

19    Capital One which was:  We make security a top priority, and we

20    will protect information with controls based on internationally

21    recognized security standards, regulations, and industry based

22    best practices.  From that same case involving the same

23    defendant, the defendant made reference, in a disclosure to

24    cardholders and its customers, that incorporated other standards

25    by reference, internationally recognized security standards,

1    regulations.

2          Here, Capital One did the same thing.  It incorporated

3    the processors' rules by reference.  And like Judge Trenga found

4    in that *Capital One Data Breach* case, that Capital One had made

5    a promise by incorporating outside standards by reference, this

6    court should also find.

7          In the *Dress vs. Capital One* case, another Virginia

8    federal court case, Capital One also argued that language at

9    issue in its self-termed cardholder agreements wasn't

10   contractual.  And the court there also found that language in

11   Capital One's cardholder agreements is contractual.  Capital One

12   has not cited any examples of courts finding these agreements in

13   particular to merely be providing cardholders with unenforceable

14   notice about as critical a term as what will happen when a

15   cardholder engages in a foreign transaction.

16         This isn't merely educating someone about how a boom

17   should be used, this is a credit card that can be used overseas.

18   And one of the critical elements of any card that allows for

19   foreign transactions is notice of how those transactions will be

20   converted.  To say that Capital One is not committed to anything

21   in that regard would allow Capital One, contractually, anyway,

22   unfettered discretion to choose whatever rate it wants; would

23   allow the processors unfettered discretion to impose as abusive

24   a rate as they would like.  Because it's not disputed that the

25   plaintiffs have no contractual relationship with Visa and

1     MasterCard.

2             So the consequences of saying that these agreements

3     promised cardholders nothing are significant, and they are about

4     a critical term in these agreements.  And Visa and MasterCard

5     are well aware.  We've cited in our motion to dismiss response

6     their arguments, which are the diametric opposite of what

7     Capital One has said.  Visa and MasterCard say to the

8     plaintiffs:  You have no quarrel with us, there's no privity

9     here, your remedy is with your bank.  Your bank possesses the

10    ultimate authority to set exchange rates on your card; go sue

11    your bank.  So where are plaintiffs to turn?

12            THE COURT:  Did you have a motion to dismiss in the

13    case you filed against MasterCard and Visa?

14            MS. DRAKE:  They have both filed motions to dismiss.

15            THE COURT:  Has it been argued?

16            MS. DRAKE:  They have not, Your Honor.

17            THE COURT:  When is it due to be argued?

18            MS. DRAKE:  We filed amended complaints in both of

19    those cases on Monday.  I believe oral argument is set in the

20    MasterCard case for early in 2022.  I don't recall offhand the

21    precise date, or whether we have a hearing date or merely a

22    status conference date set in the Visa case.

23            THE COURT:  All right.  I take it that you think that

24    if you're right on your arguments, the liability would be joint

25    and several for all three; that is, Capital, Master, and Visa?

1          MS. DRAKE:  I believe so, Your Honor.  The legal claims

2     are --

3          THE COURT:  Because you can't get more than one

4     recovery for one injury.

5          MS. DRAKE:  That's exactly right.  The legal claims are

6     different.  And so the measure of damages in a breach of

7     contract claim, as you know, is the difference between what you

8     were promised and what you received.  The claims against Visa

9     and MasterCard are pled in equity.  We don't have a contract

10    with Visa and MasterCard, so those claims are pled in equity.

11    The measure there is the benefit obtained wrongly by the

12    defendant.

13         And so the measure of damages is somewhat different,

14    because the way that Visa and MasterCard profit from inflated

15    exchange rates is a little bit different than the way that the

16    banks profit from inflated exchange rates, just because the way

17    that those two companies are situated with respect to the

18    transactions are different.  Banks get interest on unpaid

19    balances, they receive discounts on what they have to pay to the

20    processors; whereas the processors receive inflated processing

21    fees and they receive a bigger spread when they settle the

22    transactions with the merchants.  So --

23         THE COURT:  All right.  In the interest of -- life is

24    not endless.  Do this.  Why don't you address the standing

25    argument, and then Mr. Moran can respond to that and to your

1    argument on the 12(b)(6).  And then we'll be done for the day.

2         MS. DRAKE:  Thank you, Your Honor.  This is what I

3    would say on standing.  It's not a constitutional standing

4    issue.  No one is arguing that the plaintiffs were not injured.

5    This is a textbook injury from an Article III standpoint.

6    There's a financial injury and a breach of contract, either of

7    which, standing alone, is sufficient for Article III injury.

8         What this is really about is whether plaintiffs will be

9    allowed, at the motion to dismiss stage, to press claims on

10   behalf of both credit card holders and debit card holders.

11        THE COURT:  Why didn't you get a debit card holder?

12        MS. DRAKE:  We really don't think we need one.  And

13   maybe we will amend to add one --

14        THE COURT:  Well, never mind what you think you need.

15   Prudence would have dictated that.

16        MS. DRAKE:  Well, the agreements are really no

17   different, Your Honor.  The processors --

18        THE COURT:  But that doesn't -- you know, what I'm

19   saying to you is, you should have done it.  We wouldn't be here

20   arguing this if you did this.

21        MS. DRAKE:  Maybe we will, Your Honor.

22        THE COURT:  Maybe you will.  In fact, I would go out

23   and do it right now.

24        MS. DRAKE:  If the Court doesn't want me to press the

25   point further, I won't.

1          THE COURT:  Well, I don't see any point in going

2    forward on something that is problematic, uncertain, when it's

3    easily resolved.  If it's true that there are the same

4    provisions in the debit card, you have the same cause of action,

5    then you don't have this problem, and I don't end up writing an

6    opinion saying there's no standing, and then you amend, and we

7    come back.

8          The only people who profit from that are the lawyers.

9    In fact, I've been at this now for more than half a century, and

10   I'm convinced that litigation more often than not profits

11   lawyers, not parties.  Particularly in class actions.  If you

12   look at the history, I've been doing this now for 34-plus

13   years - that is, on the bench - and I am astonished at what

14   lawyers charge hourly.  I'm astonished at what lawyers seek in

15   class actions for fees.  And that comes from someone who -- when

16   I first went to work, you know what my salary was?  It was

17   $9,600 a year.  And I thought I was overpaid, and you know what?

18   I was.  My billable rate -- I was a partner in a large law firm,

19   and I think my billable rate when I was appointed to the bench

20   was somewhere between 200 and 250 dollars an hour.  And that was

21   high in those days.  Unbelievable what it is today.

22          Anyway, let's do this.  Let me take a brief recess.  Do

23   you have a central point you want to make on standing?  Because

24   I do think you have a problem on standing for the debit card

25   holders.  I don't think it's irremediable, particularly because

1    you tell me it's the same provisions, the same arguments.  But I

2    wonder why I should spend my time writing something about it.

3         MS. DRAKE:  Well, this is what I think, Your Honor.  I

4    don't think you should spend your time writing about it because

5    now is not the proper time to address the issue.  It's at

6    Rule 23.  Here's why.  Visa doesn't just have debit cards and

7    credit cards.  They have all kinds of different credit cards.

8    Right?  Banks make a lot of money by branding different credit

9    cards.  They may have a Disney credit card, an Amazon credit

10   card, credit cards that are different colors --

11        THE COURT:  But there's a fundamental difference

12   between debit and credit.

13        MS. DRAKE:  From a contractual standpoint, with regard

14   to the provisions that matter in this lawsuit, there isn't.

15   Because both of those agreements promise the use of a wholesale

16   rate, and our clients didn't get a wholesale rate.

17        You know, this comes up in products cases all the time,

18   right?  The defendant will sell five different kinds of organic

19   tea and they'll all say "organic" on the front.  The plaintiff

20   will sue and they say:  I want to certify a class about all of

21   your tea.  And the defendants come to court and say:  But you

22   only bought the strawberry tea, you didn't buy the blueberry

23   tea.  And the plaintiffs says:  But the misrepresentation on the

24   package is identical.  Why does it matter the flavor of the tea

25   or the color of the box?

1          And that's our concern here, is, I don't want to make

2     an artificial --

3          THE COURT:  I think you make a pretty good point, but I

4     still think it was, I don't want to say negligent or stupid.

5     You could just have done it and it would have eliminated that

6     whole point.

7          Anyway, I'm going to take a recess and I will then hear

8     your final argument, of which you can respond to both of those.

9          And she's made a good point now about, it doesn't make

10    any difference whether it's debit or credit, and I want to hear

11    your response about that.  But I wouldn't even be listening to

12    that if you ginned up one more person with a debit card.  But I

13    also want to hear your response to significant arguments she's

14    made about how this is a contractual obligation or a promise

15    that you've made because it's incorporated.

16         Court stands in recess.  I'll recess until 5 minutes

17    after 6:00.

18         (Recess taken at 5:49 p.m.)

19         THE COURT:  Before I come to you, Ms. Drake, let me

20    address one point, this thing about debit and Master.

21    Paragraphs 50 and 51 of your complaint set out the provisions,

22    and they're different, aren't they?  The answer is yes.  That's

23    rhetorical.

24         MS. DRAKE:  Yes.  Yes, the provisions are not

25    identical.

```
 1              THE COURT:  And doesn't that underscore the need,

 2    perhaps, to have a representative from both debit and Master for

 3    your standing problem?

 4              MS. DRAKE:  Your Honor, I guess I would like to say two

 5    things.  One is, I don't think it's a standing issue --

 6              THE COURT:  Louder, please.  I can't hear you with the

 7    mask on.

 8              MS. DRAKE:  I apologize, Your Honor.  I think the first

 9    thing I want to say is it's not properly a standing issue.  If

10    anything, it's a Rule 23 issue.  And I can see the writing on

11    the wall.  I don't want to argue with Your Honor about the

12    outcome or whether --

13              THE COURT:  And you may be right about it not being a

14    standing issue.  I may differ with you on that.

15              MS. DRAKE:  You may, Your Honor.  I would commend to

16    your consideration the Second Circuit's opinion in *Langan*, at

17    page 90.  It is a truly thoughtful analysis of why this is a

18    Rule 23 issue and not an Article III issue, and it includes

19    citations to two Supreme Court cases, including *Gratz vs.*

20    *Bollinger*, that strongly support the argument that this is best

21    considered in the context of Rule 23.

22              It's also supported by the relief that Your Honor would

23    give.  Nobody is saying that any of my plaintiffs would be

24    dismissed.  If this was an Article III issue, you would dismiss

25    claims.  If it's a Rule 23 issue, you would tell me to amend my
```

1     class definition.  And you may do that.  I would argue that it's

2     premature at this stage, but certainly within the Court's

3     discretion.

4          But the reason that I'm raising the point is that I

5     think intellectually it matters, because we shouldn't call

6     something constitutional standing if really it is a prudential

7     decision about whether it's proper for one kind of plaintiff to

8     pursue the claims of someone else.

9          THE COURT:  I'm nothing if not prudential.  Thank you.

10    You may be seated.

11         All right.  Mr. Moran, look, you said in your argument,

12    these are not promises, they're just statements.  She says, no,

13    we're entitled to rely on it; it's a promise.  And she said

14    that's a problem because we're not saying -- she says, we're not

15    saying that you didn't -- that -- we're saying that you didn't

16    keep your promise because those procedures were not used.

17    That's what she's saying.

18         Now, it occurs to me, of course, that this is a typical

19    Rule 13 issue, where you could file a third-party complaint that

20    would say, look, I'm being sued, and they tell me that I

21    promised them that I would use your procedures and you're not

22    using your procedures.  Therefore, if I'm liable to the

23    plaintiff, you're liable to me.

24         I take it you've considered whether to file a

25    third-party complaint?

1        MR. MORAN:  Well, Your Honor, for the reasons we've

2   laid out, we don't think we need to get there.  But we're not

3   foreclosing that possibility.

4        THE COURT:  Of course not.  And, you see, my interest

5   is, I don't want different judges deciding all of this.  The

6   plaintiffs' tactic is divide and conquer.  No.  I think one

7   judge ought to decide this case at the district level, and more

8   as you go up.  That's just my view, but it's a view that's had

9   50 years of gestation.

10        Now, let me hear from you, your response to her

11   argument that you, in effect, made a promise; that it's

12   different from -- her argument about the different teas didn't

13   move me, because I think this is distinguishable from that.  But

14   tell me why, if you put in there -- if you hadn't put anything

15   in there -- well, I haven't thought that through.

16        Go ahead and tell me why you think her argument is not

17   valid.

18        MR. MORAN:  Sure.  And I think Your Honor raises a

19   great point, which is, if we hadn't put it in there, for one, we

20   wouldn't be following the guidance that Visa and MasterCard

21   themselves give in their rules which encourages issuers like

22   Capital One to include a disclosure that explains how these

23   foreign transactions work.  And they don't say --

24        THE COURT:  Well, they could change it at any time.

25        MR. MORAN:  They could.  They could change their rules.

1    But they don't say -- in the rules they don't say, we encourage

2    the issuers to promise a particular rate or to issue a

3    guarantee; they say in the rules that we encourage the issuers

4    to include a disclosure that explains basically, not in

5    excruciating detail, not every jot and diddle, but that explains

6    basically to the customer what happens when you conduct a

7    foreign transaction.

8           And what plaintiff's counsel said is that if

9    Capital One didn't create a promise, then there's just

10   unfettered discretion and customers are at the mercy of bad

11   actors and they can be charged anything they want.  And I have

12   two responses to that.

13          First of all, there's no principle of contract law that

14   says that you're not allowed to have discretion, and so that if

15   you're left discretion, it must be wrong.  There must be a

16   promise somewhere because you're not allowed to have discretion.

17          But more importantly than that, Capital One didn't

18   allegedly outsource this responsibility to some unknown third

19   party or some unscrupulous actor.  These transactions are

20   processed by Visa and MasterCard, which are the two largest

21   payment processing networks in the world.  They're very

22   reputable, they're used by many issuer banks, as this series of

23   cases illustrates --

24          THE COURT:  Well, the real charge here is that they

25   didn't do what they said they were doing.

1          MR. MORAN:  That is the charge.  And frankly, that

2     obviously remains to be seen in the Visa and MasterCard case.

3     And if the Court were to conclude - we think contrary to the

4     record - that Capital One made some sort of guarantee, then we

5     might find that out in this case, too.

6          But again, we don't think we get there because

7     Capital One disclosed to its customers that their foreign

8     transactions would be processed and that a rate would be

9     selected by Visa or MasterCard, and that's exactly what happened

10    in every one of these transactions.

11         The last point I would like to make, Your Honor,

12    plaintiffs' counsel brought up Judge Trenga's ruling in the

13    security breach case.  I'm, of course, not here to weigh in on

14    the merits of that, or for my client, Capital One, who's also

15    the defendant in that case.  But I think it highlights some

16    distinctions.

17         There, in the security breach litigation, Judge Trenga

18    ruled that language that was included in something that was

19    styled as a notice or a disclosure could contain an enforceable

20    contractual promise.  And here, what we're saying is the mirror

21    image of that; that something that's styled as an agreement can

22    still contain a particular line of text, a particular

23    declarative statement that is in fact a disclosure and not an

24    enforceable promise.  And so you have to do more than look at

25    the label of the agreement to determine whether any given

1    language is promissory.

2         And in addition, the language at issue, if the Court

3    looks at the data breach litigation, the language there said, we

4    will.  We, Capital One, will do the following.  And then it

5    cited a specific series of standards and steps that would be

6    taken.

7         By contrast here, the language doesn't say that we will

8    do anything, it says that the payment card -- the card payment

9    network will do something.  And it doesn't cite specific

10   procedures.  It doesn't say that MasterCard will follow the

11   MasterCard rules and Visa will follow the Visa card rules, or

12   that they're going to take a wholesale exchange rate and then

13   they're going to do X, Y, and Z to it.  It just says, in a

14   simple declaratory manner, that they will follow their

15   procedures.  And as far as Capital One is concerned, that's what

16   happened.

17        Now plaintiffs may have --

18        THE COURT:  Is it significant that those rules could

19   change at any time by the processors?

20        MR. MORAN:  Well, I think that it further underscores

21   the lack of a contractual promise.  If Capital One were making,

22   as plaintiffs claim, a contractual guarantee that no matter what

23   happens, we promise you today, now and for always, that you're

24   going to get exactly what is included, whatever the outcome

25   that's guaranteed by the rules, then you would expect that we

1   might have some certainty about what those rules say and what

2   they're going to say in the future and the how they work.

3          So I think respectfully, the fact that the rules can

4   change, and that Capital One does not have a right to influence

5   how the rules are applied, and that once the rate is set,

6   Capital One's -- what the rules contemplate -- and plaintiffs

7   talk about this.  What the rules contemplate that Capital One

8   can do after the rate is set is to increase it.  Either

9   Capital One can apply an additional fee or it can mark up the

10  rate.  And I think it's to the benefit of Capital One's

11  customers, not to the detriment of those customers, that

12  Capital One does not do that.  And we say that we do not do it

13  in the agreement.  We say, we don't add our own fee, we don't

14  mark up the rate.

15         Now, plaintiffs want to say, well, you still have some

16  discretion after the fact to change the rate, so you're on the

17  hook.  But the reality is, the only two changes that are

18  contemplated by the rules are to the detriment of customers, and

19  we don't think that Capital One should be penalized for making

20  the responsible decision to forego those opportunities to the

21  benefit of its customers.

22         THE COURT:  On the standing issue, do you agree that

23  that issue goes away if they come up with a plaintiff?

24         MR. MORAN:  If they had the right plaintiff, I agree

25  that the argument, at least as we've framed it, would not be

1   there.  I do think that in the absence of that plaintiff, the

2   Court may very well need to address that issue, which is, of

3   course, why we raised it.  As the Court knows, there's --

4   standing is a threshold issue that generally, absent an

5   exception, has to be addressed before the merits.

6          So we don't think on this posture --

7          THE COURT:  Well, I haven't looked at this

8   Second Circuit case that she cited today.  And she contends with

9   some force that it's not a constitutional standing issue - that

10  is, an injury issue - it is an issue that is properly addressed

11  at Rule 23.

12         I would have to look at this decision that she cited.

13  I haven't looked at it.  And, of course, she may well be right.

14  But from an efficiency point of view, that's not a smart way to

15  run the railroad.  You need to get fundamental things like that

16  out of the way.  But I'm going to look at that carefully.

17         Anything else you want to say?  I think I've heard

18  enough argument this evening.

19         MR. MORAN:  And so have I, Your Honor.

20         THE COURT:  Let me say to the two of you, Ms. Drake and

21  Mr. Moran, I hear a lot of arguments, and I've heard a lot of

22  arguments in now nearly 34 plus years, 35, and 20 some years

23  before that.  And I must say, it's refreshing.  You both argued

24  very well, and I wish I had that quality argument all the time.

25  I don't.  And if I did, my work would be not easier, but at

1    least clearer.

2          Thank you for your arguments this evening.  I take it

3    you're from Richmond and you're from Minneapolis?

4          MS. DRAKE:  Yes, sir.

5          MR. MORAN:  I'm actually from Alexandria, Your Honor.

6          THE COURT:  Oh, you're local, then.  Have you got snow

7    up there?

8          MS. DRAKE:  We do, Your Honor, just this week.  We've

9    got about two inches on the ground.

10         THE COURT:  But anyway, you both did a very good job

11   and I appreciate it.  It helps me.

12         MS. DRAKE:  Thank you very much, Your Honor.  Thank

13   you.

14         THE COURT:  The issues you raised are not as easy.  I

15   don't think your boom case was on the mark, I don't think your

16   tea hypothetical was on the mark, but they're helpful and I'll

17   think more about this and the arguments that you've made.  Thank

18   you.

19         Oh, maybe one more question.  The other suits against

20   the processors, are there only two?  How many are there?

21         MS. DRAKE:  There are two suits against the processors,

22   yes.

23         THE COURT:  Master and Visa?

24         MS. DRAKE:  Yes.

25         THE COURT:  Separately?

```
 1              MS. DRAKE:  Yes.

 2              THE COURT:  And where are they pending?

 3              MS. DRAKE:  They're both headed where Visa and

 4   MasterCard are headquartered.  So MasterCard is in New York and

 5   Visa is in California.  MasterCard's lawyer is actually here

 6   today observing.

 7              THE COURT:  Nice to see you, sir.  And the other person

 8   here is just...

 9              UNIDENTIFIED SPEAKER:  I represent Visa.

10              THE COURT:  So they're both here.  So they both want me

11   to say, just sue them on a third-party complaint.

12              MS. DRAKE:  If they agree to be here, we're fine with

13   it.

14              THE COURT:  It's interesting, because I think your

15   fundamental argument is that they didn't follow their process

16   rules.  Right?

17              MS. DRAKE:  That's correct, Your Honor.

18              THE COURT:  All right.  Thank you all.  I hope you all

19   have a very Merry Christmas and a Happy New Year.

20              (Off the record at 6:27 p.m.)

21

22

23

24

25
```

45

1          CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, Rebecca Stonestreet, certify that the foregoing is a

4     correct transcript from the record of proceedings in the

5     above-entitled matter.

6

7

8

9     ____//Rebecca Stonestreet//___              _____

10    SIGNATURE OF COURT REPORTER                     DATE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**$**

**$9,600** [1] - 32:17

**'**

**'80s** [1] - 6:25
**'foreign** [1] - 16:17

**/**

**//Rebecca** [1] - 45:9

**1**

**1** [1] - 2:9
**1,500** [4] - 14:20, 14:25, 15:3, 15:6
**12(b)(6** [2] - 4:3, 4:25
**12(b)(6)** [2] - 21:6, 31:1
**1229** [1] - 1:15
**13** [1] - 36:19
**14** [1] - 18:7
**15** [1] - 18:13
**16th** [1] - 1:22
**17** [6] - 13:14, 13:18, 13:19, 14:1, 14:3, 26:17
**1880** [1] - 7:1
**1980's** [1] - 6:25
**1:21-CV-00803-TSE-IDD** [1] - 1:4

**2**

**20** [1] - 42:22
**200** [1] - 32:20
**20006** [1] - 1:23
**2005** [1] - 15:11
**202** [1] - 1:19
**202-857-1700** [1] - 1:24
**2021** [1] - 1:6
**2021-CV-803** [1] - 3:4
**2022** [1] - 29:20
**205** [1] - 1:15
**22030** [1] - 1:19
**22314** [1] - 2:7
**23** [6] - 33:6, 35:10, 35:18, 35:21, 35:25, 42:11
**23219** [1] - 2:3
**240** [1] - 2:7
**250** [1] - 32:20
**28-1** [2] - 10:16, 10:17
**28-2** [1] - 16:12

**3**

**34** [1] - 42:22
**34-plus** [1] - 32:12
**35** [1] - 42:22

**38** [1] - 16:12
**3925** [1] - 1:18

**4**

**4-year-old** [1] - 13:12
**401** [1] - 2:6
**426-7767** [1] - 2:7
**4:55** [1] - 1:6

**5**

**5** [1] - 34:16
**50** [3] - 25:21, 34:21, 37:9
**500** [1] - 1:22
**51** [1] - 34:21
**54** [3] - 23:11, 25:16, 26:3
**55** [3] - 23:11, 25:16, 26:4
**55413** [1] - 1:16
**5:49** [1] - 34:18

**6**

**612-594-5933** [1] - 1:16
**6:00** [1] - 34:17
**6:27** [1] - 44:20

**7**

**7** [1] - 13:24
**703-424-7570** [1] - 1:20

**8**

**800** [1] - 2:3
**804-775-7887** [1] - 2:4
**888** [1] - 1:22
**89** [1] - 18:2

**9**

**9** [3] - 1:6, 10:16, 19:3
**9(b** [1] - 19:17
**90** [2] - 18:23, 35:17
**9th** [1] - 2:6

**A**

**abide** [1] - 23:23
**able** [1] - 3:15
**above-entitled** [1] - 45:5
**absence** [1] - 42:1
**absent** [1] - 42:4
**abusive** [1] - 3:16
**according** [3] - 23:8, 24:8, 24:10
**account** [2] - 16:11, 16:18

**acquiring** [2] - 18:15, 18:22
**action** [2] - 6:2, 32:4
**actions** [3] - 7:16, 32:11, 32:15
**actor** [1] - 38:19
**actors** [1] - 38:11
**actual** [2] - 18:15, 18:21
**add** [2] - 31:13, 41:13
**addition** [2] - 22:1, 40:2
**additional** [2] - 8:14, 41:9
**address** [7] - 9:4, 9:23, 12:5, 30:24, 33:5, 34:20, 42:2
**addressed** [2] - 42:5, 42:10
**addressing** [1] - 21:13
**adjust** [2] - 10:25, 24:4
**adopted** [1] - 11:12
**advantageous** [1] - 4:16
**affect** [1] - 7:24
**afternoon** [3] - 3:6, 3:23, 3:25
**agents** [1] - 22:22
**ago** [1] - 6:20
**agree** [5] - 9:5, 14:11, 41:22, 41:24, 44:12
**agreed** [2] - 23:2, 23:18
**agreement** [21] - 10:13, 10:18, 13:4, 15:13, 15:17, 15:21, 15:23, 16:1, 16:9, 16:12, 18:20, 20:3, 22:24, 25:9, 25:18, 25:19, 25:20, 25:24, 39:21, 39:25, 41:13
**Agreement** [1] - 13:17
**agreements** [19] - 9:15, 10:12, 12:3, 14:9, 17:23, 18:23, 22:3, 22:20, 22:21, 26:7, 26:11, 26:21, 28:9, 28:11, 28:12, 29:2, 29:4, 31:16, 33:15
**ahead** [3] - 9:4, 27:1, 37:16
**airport** [1] - 4:11
**al** [2] - 3:3
**Alexandria** [3] - 1:2, 2:7, 43:5
**allegation** [2] - 4:20, 18:3, 18:5
**allegations** [4] - 6:9,

9:3, 19:15, 20:18
**allege** [4] - 17:22, 18:7, 18:13, 18:23
**alleged** [3] - 9:12, 17:22, 19:20
**allegedly** [3] - 18:17, 19:21, 38:18
**allow** [2] - 28:21, 28:23
**allowed** [3] - 31:9, 38:14, 38:16
**allows** [1] - 28:18
**alone** [1] - 31:7
**Amazon** [1] - 33:9
**amend** [3] - 31:13, 32:6, 35:25
**amended** [1] - 29:18
**America** [2] - 22:11
**amount** [2] - 10:21, 15:23
**amused** [1] - 6:17
**amusing** [1] - 7:17
**analysis** [5] - 18:18, 20:20, 20:21, 35:17
**answer** [3] - 22:13, 22:14, 34:22
**answered** [1] - 10:11
**answers** [1] - 20:6
**anxious** [1] - 3:14
**anyway** [5] - 7:2, 28:21, 32:22, 34:7, 43:10
**apologize** [1] - 35:8
**Appeals** [1] - 15:11
**appearances** [2] - 3:4, 3:12
**APPEARANCES** [2] - 1:13, 1:25
**appeared** [2] - 6:23
**applicable** [1] - 18:2
**application** [1] - 25:7
**applied** [6] - 4:21, 5:8, 9:20, 17:24, 24:5, 41:5
**apply** [5] - 9:25, 20:7, 23:16, 23:17, 41:9
**appointed** [2] - 32:19
**appreciate** [2] - 8:14, 43:11
**appropriate** [1] - 7:17
**approximate** [1] - 18:14
**argue** [6] - 4:15, 4:25, 5:16, 6:25, 12:3, 12:8, 35:11, 36:1
**argued** [2] - 21:14, 28:8, 29:15, 29:17, 42:23
**argues** [1] - 21:10
**arguing** [2] - 31:4,

31:20
**argument** [24] - 5:22, 5:24, 12:4, 12:7, 12:14, 17:15, 21:6, 21:7, 27:2, 27:3, 27:12, 29:19, 30:25, 31:1, 34:8, 35:20, 36:11, 37:11, 37:12, 37:16, 41:25, 42:18, 42:24, 44:15
**arguments** [9] - 25:8, 29:6, 29:24, 33:1, 34:13, 42:21, 42:22, 43:2, 43:17
**arrived** [1] - 4:11
**Article** [5] - 6:15, 31:5, 31:7, 35:18, 35:24
**artificial** [1] - 34:2
**aside** [3] - 13:12, 20:1, 21:2
**assure** [1] - 16:4
**astonished** [2] - 32:13, 32:14
**attached** [1] - 26:12
**attempt** [1] - 25:2
**authored** [1] - 15:12
**authority** [1] - 29:10
**available** [2] - 10:3, 20:14
**avoid** [1] - 7:7
**awarded** [1] - 7:21
**aware** [1] - 29:5

**B**

**backwards** [1] - 9:6
**bad** [1] - 38:10
**balances** [1] - 30:19
**bank** [5] - 22:2, 29:9, 29:11
**BANK** [1] - 1:8
**Bank** [6] - 3:3, 22:11
**banks** [5] - 21:25, 22:6, 30:16, 30:18, 33:8, 38:22
**banks'** [2] - 22:2, 22:7
**based** [5] - 20:18, 20:21, 27:18, 27:20, 27:21
**basic** [2] - 12:15, 17:15
**Battle** [1] - 6:21
**bear** [7] - 17:25, 18:4, 18:7, 18:21, 18:25, 19:13, 20:4
**became** [1] - 15:6
**beef** [2] - 22:17
**BEFORE** [1] - 1:11
**begin** [2] - 4:4, 21:12
**behalf** [7] - 1:5, 3:7,

3:19, 6:8, 7:11, 9:9,
31:10
**behind** [1] - 3:10
**bench** [2] - 32:13,
32:19
**benefit** [3] - 30:11,
41:10, 41:21
**BERGER** [1] - 1:14
**best** [2] - 27:22, 35:20
**better** [1] - 11:24
**between** [9] - 5:4,
15:13, 16:19, 18:25,
20:7, 20:9, 30:7,
32:20, 33:12
**beyond** [1] - 15:19
**bid** [1] - 19:8
**bid/ask** [3] - 19:1,
19:13, 20:8
**big** [1] - 24:3
**bigger** [1] - 30:21
**billable** [2] - 32:18,
32:19
**binding** [3] - 13:7,
17:9, 25:11
**bit** [3] - 7:16, 9:6,
30:15
**Black** [1] - 1:23
**blueberry** [1] - 33:22
**Bollinger** [1] - 35:20
**boom** [11] - 13:12,
13:13, 13:14, 13:15,
13:18, 13:19, 13:23,
14:5, 26:17, 28:16,
43:15
**Boothe** [1] - 6:21
**border** [1] - 16:15
**borrower** [2] - 22:11
**bought** [1] - 33:2
**box** [1] - 33:25
**brain** [2] - 24:25, 25:5
**branding** [1] - 33:8
**breach** [7] - 23:21,
27:18, 30:6, 31:6,
39:13, 39:17, 40:3
**Breach** [2] - 27:11,
28:4
**Bridge** [1] - 1:18
**brief** [1] - 32:22
**briefing** [3] - 5:17,
8:14, 24:3
**briefly** [1] - 7:20
**briefs** [2] - 4:2, 23:25
**bring** [2] - 6:3, 6:13
**BROFMAN** [1] - 1:4
**brought** [3] - 6:8,
7:11, 39:12
**build** [3] - 14:18,
14:24, 15:3
**builder** [1] - 14:17
**building** [1] - 15:6

**built** [3] - 14:16,
14:21, 14:22
**burden** [2] - 17:12,
21:8
**buy** [1] - 33:22

# C

**CAHOON** [1] - 1:17
**calculate** [1] - 9:24
**calculates** [1] - 16:21
**California** [1] - 44:5
**Canal** [1] - 2:3
**cannot** [1] - 15:17
**Capital** [71] - 3:3, 4:8,
4:15, 5:6, 6:9, 8:4,
9:2, 9:10, 9:12, 9:16,
10:8, 11:4, 11:11,
11:13, 12:10, 13:4,
16:3, 17:2, 18:1,
18:17, 19:18, 19:23,
20:23, 21:14, 22:1,
22:21, 23:1, 23:14,
23:18, 24:3, 24:4,
24:6, 24:7, 24:8,
24:9, 25:8, 25:24,
26:7, 26:10, 26:15,
27:10, 27:11, 27:13,
27:19, 28:2, 28:4,
28:7, 28:8, 28:11,
28:20, 28:21, 29:7,
29:25, 37:22, 38:9,
38:17, 39:4, 39:7,
39:14, 40:4, 40:15,
40:21, 41:4, 41:6,
41:7, 41:9, 41:10,
41:12, 41:19
**capital** [1] - 12:22
**CAPITAL** [2] - 1:8, 1:9
**card** [28] - 4:9, 6:1,
6:2, 8:4, 10:13,
10:15, 12:2, 12:10,
16:13, 18:19, 19:10,
22:23, 25:20, 26:21,
28:17, 28:18, 29:10,
31:10, 31:11, 32:4,
32:24, 33:9, 33:10,
34:12, 40:8, 40:11
**Card** [6] - 10:19,
10:21, 11:7, 12:19,
16:1, 25:25
**cardholder** [5] - 4:17,
9:15, 28:9, 28:11,
28:18
**cardholders** [9] -
4:22, 10:8, 18:25,
22:21, 25:13, 26:7,
27:24, 28:13, 29:3
**cardholders'** [1] - 9:17
**cards** [5] - 5:19, 6:10,
6:11, 8:3, 9:2, 33:6,

33:7, 33:9, 33:10
**carefully** [2] - 8:6,
42:16
**Carolina** [1] - 22:12
**carved** [1] - 7:22
**case** [27] - 3:2, 3:4,
4:15, 6:23, 7:5,
13:19, 14:19, 15:8,
15:9, 21:16, 27:11,
27:13, 27:17, 27:22,
28:4, 28:7, 28:8,
29:13, 29:20, 29:22,
37:7, 39:2, 39:5,
39:13, 39:15, 42:8,
43:15
**Case** [1] - 1:4
**cases** [7] - 13:1, 13:7,
21:25, 29:19, 33:17,
35:19, 38:23
**center** [1] - 9:18
**central** [4] - 4:20,
17:10, 22:14, 32:23
**century** [1] - 32:9
**certainly** [2] - 8:19,
36:2
**certainty** [1] - 41:1
**CERTIFICATE** [1] -
45:1
**certification** [1] - 6:4
**certify** [2] - 33:20,
45:3
**Chain** [1] - 1:18
**CHAKRABORTY** [1] -
1:4
**change** [8] - 24:9,
24:11, 24:14, 37:24,
37:25, 40:19, 41:4,
41:16
**changes** [1] - 41:17
**changing** [3] - 19:6,
19:7, 19:8
**charge** [5] - 10:25,
14:5, 32:14, 38:24,
39:1
**charged** [9] - 18:3,
18:18, 19:13, 20:8,
20:9, 20:21, 20:25,
38:11
**choose** [2] - 10:3,
28:22
**Christmas** [1] - 44:19
**chuckle** [1] - 25:3
**chuckled** [1] - 24:17
**Circuit** [2] - 15:11,
42:8
**Circuit's** [1] - 35:16
**citations** [1] - 35:19
**cite** [2] - 23:11, 40:9
**cited** [6] - 13:2, 28:12,
29:5, 40:5, 42:8,

42:12
**civil** [1] - 3:2
**Civil** [1] - 1:4
**claim** [5] - 4:7, 9:13,
27:18, 30:7, 40:22
**claimed** [1] - 17:4
**claims** [10] - 6:13,
17:11, 19:18, 30:1,
30:5, 30:8, 30:10,
31:9, 35:25, 36:8
**class** [12] - 4:8, 4:15,
5:1, 6:2, 6:4, 6:18,
7:6, 7:15, 32:11,
32:15, 33:20, 36:1
**classes** [1] - 21:25
**classified** [1] - 16:14
**clear** [2] - 5:3, 19:22
**cleared** [1] - 20:15
**clearer** [1] - 43:1
**clearly** [1] - 13:8
**CLERK** [1] - 3:2
**client** [1] - 39:14
**clients** [1] - 33:16
**closest** [2] - 11:7,
12:18
**colleague** [2] - 3:19,
3:24
**color** [1] - 33:25
**colors** [1] - 33:10
**comfortable** [2] - 3:9,
3:13
**commend** [2] - 27:8,
35:15
**commercial** [1] -
15:13
**committed** [1] - 28:20
**common** [1] - 7:15
**communicate** [1] -
25:1
**companies** [1] - 30:17
**Company** [3] - 13:9,
13:10, 13:23
**company** [2] - 13:15,
13:24
**complained** [1] - 22:9
**complaint** [16] - 6:7,
7:11, 9:14, 17:22,
17:23, 18:2, 19:15,
20:17, 23:12, 25:16,
25:17, 25:19, 34:21,
36:19, 36:25, 44:11
**complaints** [1] - 29:18
**complicated** [1] - 25:4
**COMPUTERIZED** [1] -
2:11
**concept** [4] - 18:17,
19:3, 19:4, 19:10
**concern** [1] - 34:1
**concerned** [1] - 40:15
**conclude** [1] - 39:3

**conclusions** [1] -
11:23
**conclusory** [1] - 20:20
**conduct** [3] - 22:5,
22:10, 38:6
**conducted** [1] - 9:25
**conference** [1] - 29:22
**confess** [1] - 7:8
**conflict** [2] - 7:7, 8:12
**conflicting** [2] - 20:11,
20:16
**connect** [2] - 12:23,
18:11
**conquer** [1] - 37:6
**consequences** [1] -
29:2
**consideration** [1] -
35:16
**considered** [2] -
35:21, 36:24
**constitutional** [3] -
31:3, 36:6, 42:9
**construction** [3] -
13:11, 13:16, 14:5
**construe** [1] - 12:21
**contain** [4] - 9:21,
14:9, 39:19, 39:22
**contained** [1] - 15:21
**contains** [3] - 5:7, 6:9,
19:12
**contemplate** [2] -
41:6, 41:7
**contemplated** [1] -
41:18
**contends** [1] - 42:8
**contention** [2] - 11:2,
17:10
**context** [1] - 35:21
**CONTINUED** [1] - 1:25
**contract** [20] - 4:25,
5:4, 5:7, 5:20, 9:2,
9:21, 15:6, 15:7,
15:13, 17:19, 19:10,
20:12, 20:22, 21:3,
27:14, 27:18, 30:7,
30:9, 31:6, 38:13
**contracts** [2] - 9:7,
9:19
**contractual** [15] -
14:10, 15:23, 18:6,
18:11, 20:4, 27:5,
27:15, 28:10, 28:11,
28:25, 33:13, 34:14,
39:20, 40:21, 40:22
**contractually** [4] -
4:22, 4:23, 17:9,
28:21
**contrary** [1] - 39:3
**contrast** [1] - 40:7
**controls** [1] - 27:20

**conversion** [9] - 10:22, 11:1, 11:8, 12:20, 13:5, 16:2, 23:4, 25:25
**convert** [3] - 10:20, 23:6, 23:7
**converted** [1] - 28:20
**convinced** [1] - 32:10
**correct** [7] - 4:7, 5:3, 5:12, 5:20, 5:21, 44:17, 45:4
**costs** [2] - 18:15, 18:21
**counsel** [2] - 38:8, 39:12
**couple** [1] - 27:4
**course** [9] - 7:12, 14:17, 14:23, 15:1, 36:18, 37:4, 39:13, 42:3, 42:13
**court** [11] - 3:2, 3:11, 3:15, 13:22, 14:25, 27:13, 28:6, 28:8, 28:10, 33:21, 34:16
**Court** [17] - 2:6, 4:1, 5:13, 6:7, 7:10, 7:14, 15:11, 21:21, 21:24, 24:17, 27:9, 31:24, 35:19, 39:3, 40:2, 42:2, 42:3
**COURT** [76] - 1:1, 2:5, 3:8, 3:16, 3:21, 3:25, 4:7, 4:23, 5:5, 5:10, 5:14, 5:22, 6:5, 6:14, 6:16, 7:13, 8:2, 8:12, 8:17, 8:21, 8:24, 11:17, 11:22, 12:6, 12:13, 21:5, 21:12, 21:18, 22:13, 23:20, 23:24, 24:1, 24:22, 25:1, 25:15, 25:17, 25:22, 26:14, 27:1, 29:12, 29:15, 29:17, 29:23, 30:3, 30:23, 31:11, 31:14, 31:18, 31:22, 32:1, 33:11, 34:3, 34:19, 35:1, 35:6, 35:13, 36:9, 37:4, 37:24, 38:24, 40:18, 41:22, 42:7, 42:20, 43:6, 43:10, 43:14, 43:23, 43:25, 44:2, 44:7, 44:10, 44:14, 44:18, 45:1, 45:10
**Court's** [1] - 36:2
**Courthouse** [1] - 2:6
**COURTROOM** [1] - 3:2
**courts** [1] - 28:12

**covenants** [1] - 15:18
**cover** [1] - 6:17
**covered** [1] - 21:5
**create** [3] - 13:6, 19:24, 38:9
**created** [2] - 17:23, 18:24
**credit** [21] - 4:8, 5:19, 6:1, 6:11, 9:2, 10:13, 10:15, 18:19, 19:10, 22:23, 25:20, 28:17, 31:10, 33:7, 33:8, 33:9, 33:10, 33:12, 34:10
**criminal** [1] - 15:14
**critical** [3] - 28:14, 28:18, 29:4
**cross** [1] - 16:15
**CRR** [1] - 2:5
**crux** [1] - 4:7
**curious** [1] - 17:2
**Currencies** [1] - 10:18
**currencies** [1] - 16:14
**currency** [17] - 4:12, 10:19, 10:22, 10:25, 11:8, 12:20, 13:5, 16:2, 16:18, 16:19, 16:22, 17:25, 18:15, 18:22, 23:4, 25:25
**customer** [3] - 16:6, 17:8, 38:6
**customers** [13] - 11:3, 18:19, 19:11, 22:5, 23:14, 24:9, 27:24, 38:10, 39:7, 41:11, 41:18, 41:21

### D

**damage** [1] - 13:20
**damages** [3] - 7:21, 30:6, 30:13
**Data** [2] - 27:11, 28:4
**data** [1] - 40:3
**DATE** [1] - 45:10
**date** [8] - 10:23, 10:24, 16:24, 16:25, 18:2, 29:21, 29:22
**days** [3] - 4:10, 11:25, 32:21
**DC** [1] - 1:23
**deal** [1] - 24:3
**debating** [1] - 11:20
**debit** [15] - 5:19, 6:2, 6:9, 12:2, 26:21, 31:10, 31:11, 32:4, 32:24, 33:6, 33:12, 34:10, 34:12, 34:20, 35:2
**December** [1] - 1:6

**decide** [1] - 37:7
**deciding** [1] - 37:5
**decision** [4] - 15:11, 36:7, 41:20, 42:12
**decisions** [1] - 27:8
**declarative** [3] - 14:9, 15:20, 39:23
**declaratory** [1] - 40:14
**defendant** [12] - 3:22, 15:2, 15:14, 22:15, 26:12, 27:6, 27:9, 27:23, 30:12, 33:18, 39:15
**DEFENDANTS** [2] - 1:21, 2:1
**Defendants** [1] - 1:9
**defendants** [3] - 3:24, 5:6, 33:21
**define** [2] - 6:18, 17:20
**defined** [1] - 7:3
**defining** [1] - 7:6
**definite** [1] - 24:16
**definition** [3] - 18:6, 18:11, 36:1
**delegates** [1] - 22:22
**demonstrated** [1] - 26:11
**demonstrates** [1] - 26:22
**deposit** [3] - 16:9, 16:11, 26:11
**description** [1] - 26:20
**despite** [1] - 16:8
**detail** [4] - 9:1, 9:15, 9:19, 38:5
**detailed** [1] - 9:22
**determine** [2] - 8:9, 39:25
**determined** [1] - 24:7
**detriment** [2] - 41:11, 41:18
**developed** [1] - 24:10
**diametric** [1] - 29:6
**dictated** [1] - 31:15
**diddle** [1] - 38:5
**differ** [2] - 10:23, 35:14
**difference** [3] - 30:7, 33:11, 34:10
**different** [18] - 5:19, 17:20, 18:5, 21:13, 23:5, 30:6, 30:13, 30:15, 30:18, 31:17, 33:7, 33:8, 33:10, 33:18, 34:22, 37:5, 37:12
**differently** [1] - 6:6
**directly** [1] - 7:23
**disadvantageous** [1] -

4:10
**disclose** [1] - 20:19
**disclosed** [2] - 15:4, 39:7
**disclosing** [1] - 14:2
**disclosure** [7] - 16:6, 27:7, 27:23, 37:22, 38:4, 39:19, 39:23
**disclosures** [1] - 14:13
**discounts** [1] - 30:19
**discretion** [8] - 28:22, 28:23, 36:3, 38:10, 38:14, 38:15, 38:16, 41:16
**discussion** [1] - 14:17
**discussions** [2] - 15:1, 21:22
**dismiss** [9] - 4:1, 4:2, 6:3, 9:19, 29:5, 29:12, 29:14, 31:9, 35:24
**dismissed** [1] - 35:24
**Disney** [1] - 33:9
**dispute** [1] - 5:4
**disputed** [1] - 28:24
**distinctions** [1] - 39:16
**distinguishable** [1] - 37:13
**District** [1] - 2:6
**DISTRICT** [3] - 1:1, 1:1, 1:12
**district** [1] - 37:7
**divide** [1] - 37:6
**Division** [1] - 1:2
**document** [3] - 12:24, 23:10, 27:13
**documents** [1] - 23:2
**dollar** [1] - 10:21
**dollars** [5] - 16:19, 16:20, 19:6, 19:7, 32:20
**done** [4] - 19:12, 31:1, 31:19, 34:5
**Drake** [7] - 3:6, 3:18, 8:22, 21:10, 21:12, 34:19, 42:20
**DRAKE** [43] - 1:14, 3:6, 3:14, 3:18, 8:23, 21:17, 21:20, 22:20, 23:22, 23:25, 24:2, 24:24, 25:2, 25:16, 25:20, 25:24, 26:19, 27:4, 29:14, 29:16, 29:18, 30:1, 30:5, 31:2, 31:12, 31:16, 31:21, 31:24, 33:3, 33:13, 34:24, 35:4, 35:8, 35:15, 43:4,

43:8, 43:12, 43:21, 43:24, 44:1, 44:3, 44:12, 44:17
**Dress** [1] - 28:7
**due** [1] - 29:17
**during** [1] - 15:15

### E

**early** [1] - 29:20
**easier** [2] - 3:10, 42:25
**easily** [1] - 32:3
**East** [1] - 2:3
**EASTERN** [1] - 1:1
**easy** [1] - 43:14
**ECF** [2] - 10:16, 16:12
**educate** [1] - 17:8
**educating** [1] - 28:16
**effect** [3] - 10:22, 10:23, 37:11
**efficiency** [1] - 42:14
**either** [6] - 4:9, 7:18, 15:19, 16:22, 31:6, 41:8
**ELEANOR** [1] - 1:14
**electric** [2] - 13:14, 26:18
**electrical** [5] - 13:18, 13:20, 13:24, 14:1, 14:4
**elements** [1] - 28:18
**eliminated** [1] - 34:5
**ELIZABETH** [1] - 2:1
**ELLIS** [1] - 1:11
**Emily** [1] - 3:3
**EMILY** [1] - 1:3
**encompasses** [1] - 22:5
**encourage** [2] - 38:1, 38:3
**encourages** [1] - 37:21
**end** [10] - 11:1, 16:17, 17:1, 17:16, 17:17, 18:9, 18:14, 18:16, 19:2, 32:5
**endless** [1] - 30:24
**enforceable** [6] - 13:6, 15:7, 15:23, 16:2, 39:19, 39:24
**engage** [1] - 23:15
**engages** [1] - 28:15
**ensued** [1] - 13:20
**enter** [1] - 15:5
**entitled** [5] - 11:3, 17:15, 20:23, 36:13, 45:5
**equipment** [3] - 13:11, 14:3
**equity** [2] - 30:9,

30:10
**especially** [2] - 17:13, 20:23
**essentially** [1] - 27:11
**establishes** [1] - 14:8
**et** [2] - 3:3
**Euro** [1] - 4:13
**Europe** [1] - 4:11
**evening** [2] - 42:18, 43:2
**exacerbated** [1] - 19:22
**exactly** [3] - 30:5, 39:9, 40:24
**example** [4] - 20:12, 22:9, 23:5, 26:13
**examples** [1] - 28:12
**exceed** [2] - 4:22, 20:21
**excellent** [1] - 21:20
**exception** [1] - 42:5
**exchange** [30] - 4:9, 4:14, 4:16, 4:21, 8:9, 10:1, 10:2, 10:25, 12:9, 16:19, 16:21, 17:16, 17:17, 18:6, 18:8, 18:12, 18:18, 20:14, 20:16, 22:16, 22:18, 22:19, 24:19, 25:8, 25:9, 25:12, 29:10, 30:15, 30:16, 40:12
**exclude** [3] - 7:4, 7:7, 7:16
**excludes** [1] - 6:18
**exclusive** [1] - 14:20
**excruciating** [1] - 38:5
**Exhibit** [1] - 10:15
**existence** [1] - 9:9
**expect** [4] - 10:10, 14:13, 25:11, 40:25
**expectation** [4] - 15:4, 15:22, 17:24, 18:24
**expected** [1] - 15:15
**experienced** [1] - 19:1
**explains** [3] - 37:22, 38:4, 38:5

### F

**fact** [14] - 8:2, 13:3, 14:25, 15:22, 22:22, 24:4, 24:6, 25:18, 26:10, 31:22, 32:9, 39:23, 41:3, 41:16
**fails** [2] - 12:14, 12:16
**fair** [4] - 17:14, 21:1, 21:17, 21:19
**Fairfax** [1] - 1:19
**fairness** [1] - 21:18

familiarity [1] - 4:2
**far** [2] - 21:23, 40:15
**Farrell** [3] - 13:9, 14:14, 14:15
**favor** [1] - 11:18
**federal** [1] - 2:8
**fee** [2] - 41:9, 41:13
**fees** [3] - 11:1, 30:21, 32:15
**feet** [7] - 13:14, 13:18, 13:19, 13:24, 14:1, 14:3, 26:17
**figure** [1] - 23:9
**file** [2] - 36:19, 36:24
**filed** [3] - 29:13, 29:14, 29:18
**final** [2] - 6:17, 34:8
**financial** [1] - 31:6
**fine** [1] - 44:12
**finish** [1] - 27:1
**firm** [3] - 6:21, 6:22, 32:18
**first** [12] - 3:4, 4:11, 10:13, 12:17, 14:20, 19:19, 21:4, 24:12, 27:10, 32:16, 35:8, 38:13
**five** [1] - 33:18
**fixed** [1] - 10:2
**flavor** [1] - 33:24
**Floor** [1] - 2:6
**fluctuate** [1] - 4:14
**focus** [1] - 8:7
**follow** [5] - 12:21, 40:10, 40:11, 40:14, 44:15
**followed** [1] - 10:10
**FOLLOWING** [1] - 1:25
**following** [2] - 37:20, 40:4
**FOR** [4] - 1:1, 1:14, 1:21, 2:1
**force** [1] - 42:9
**foreclosing** [1] - 37:3
**forego** [1] - 41:20
**foregoing** [1] - 45:3
**foreign** [24] - 4:20, 4:21, 5:9, 9:17, 9:25, 10:19, 12:9, 16:13, 16:17, 16:18, 16:19, 16:23, 17:25, 18:15, 18:22, 23:4, 23:15, 24:19, 25:8, 28:15, 28:19, 37:23, 38:7, 39:7
**Foreign** [1] - 10:18
**forth** [1] - 26:24
**forward** [1] - 32:2
**four** [1] - 14:23

**frame** [1] - 27:6
**framed** [1] - 41:25
**frankly** [2] - 11:15, 39:1
**front** [1] - 33:19
**fuel** [1] - 11:23
**fundamental** [3] - 33:11, 42:15, 44:15
**funny** [1] - 24:25
**future** [2] - 15:22, 41:2
**FX** [4] - 9:17, 9:24, 10:9, 19:2

### G

**game** [1] - 7:22
**Gateway** [1] - 2:2
**generally** [3] - 8:25, 16:15, 42:4
**generate** [1] - 19:9
**gestation** [1] - 37:9
**ginned** [1] - 34:12
**gist** [1] - 4:17
**given** [3] - 9:3, 10:4, 39:25
**glad** [1] - 21:19
**government** [1] - 16:22
**Gratz** [1] - 35:19
**great** [1] - 37:19
**ground** [1] - 43:9
**guarantee** [5] - 11:4, 16:3, 38:3, 39:4, 40:22
**guaranteed** [1] - 40:25
**guaranteeing** [1] - 11:13
**guess** [3] - 8:13, 15:8, 35:4
**guidance** [1] - 37:20
**GUZZO** [1] - 1:18

### H

**half** [1] - 32:9
**hallmark** [1] - 21:18
**Hamdi** [1] - 15:10
**happy** [1] - 8:15
**Happy** [1] - 44:19
**harmful** [1] - 24:5
**headed** [1] - 44:3
**heading** [1] - 10:17
**headquartered** [2] - 22:11, 44:4
**hear** [7] - 21:7, 34:7, 34:10, 34:13, 35:6, 37:10, 42:21
**heard** [3] - 22:13, 42:17, 42:21
**hearing** [1] - 29:21
**HEARING** [1] - 1:11

**heart** [1] - 4:19
**help** [2] - 11:24, 13:7
**helpful** [1] - 43:16
**helps** [1] - 43:11
**high** [1] - 32:21
**higher** [1] - 17:12
**highlights** [1] - 39:15
**history** [1] - 32:12
**hit** [1] - 26:18
**holder** [1] - 31:11
**holders** [6] - 6:1, 6:2, 10:15, 31:10, 32:25
**home** [2] - 22:6, 22:7
**homes** [1] - 14:16
**Honor** [45] - 3:6, 3:14, 3:18, 3:23, 4:6, 4:18, 5:3, 5:21, 7:8, 7:19, 8:11, 8:14, 8:20, 8:23, 11:21, 12:2, 12:12, 12:16, 15:24, 17:14, 19:4, 21:17, 23:25, 25:3, 26:10, 26:19, 29:16, 30:1, 31:2, 31:17, 31:21, 33:3, 35:4, 35:8, 35:11, 35:15, 35:22, 37:1, 37:18, 39:11, 42:19, 43:5, 43:8, 43:12, 44:17
**HONORABLE** [1] - 1:11
**hook** [2] - 11:9, 41:17
**hope** [1] - 44:18
**hopefully** [1] - 23:9
**hour** [1] - 32:20
**hourly** [1] - 32:14
**houses** [6] - 14:18, 14:20, 14:23, 14:25, 15:3, 15:6
**humor** [1] - 25:3
**humorous** [1] - 11:25
**hypothetical** [1] - 43:16

### I

**i.e** [1] - 16:24
**identical** [2] - 33:24, 34:25
**identifies** [1] - 9:14
**Ill** [6] - 1:11, 6:15, 31:5, 31:7, 35:18, 35:24
**illustrate** [1] - 13:8
**illustrates** [4] - 14:8, 15:9, 17:7, 38:23
**image** [1] - 39:21
**important** [2] - 13:2, 19:16
**importantly** [2] - 20:1,

38:17
**impose** [1] - 28:23
**improper** [1] - 18:14
**inches** [1] - 43:9
**include** [4] - 6:10, 21:25, 37:22, 38:4
**included** [5] - 10:15, 15:14, 16:20, 39:18, 40:24
**includes** [1] - 35:18
**including** [1] - 35:19
**incorporated** [7] - 12:18, 12:24, 26:6, 26:8, 27:24, 28:2, 34:15
**incorporates** [1] - 12:10
**incorporating** [2] - 11:11, 28:5
**incorporation** [2] - 12:7, 22:25
**increase** [1] - 41:8
**indicate** [1] - 14:12
**indicated** [1] - 16:8
**indicating** [1] - 13:23
**indicative** [1] - 14:11
**indisputably** [1] - 15:21
**individual** [2] - 6:8, 7:11
**industrial** [1] - 13:11
**industry** [1] - 27:21
**inflated** [3] - 30:14, 30:16, 30:20
**influence** [1] - 41:4
**inform** [1] - 17:8
**information** [1] - 27:20
**injunctive** [2] - 6:10, 7:23
**injured** [1] - 31:4
**injury** [5] - 30:4, 31:5, 31:6, 31:7, 42:10
**insight** [1] - 19:24
**instance** [1] - 24:12
**Insurance** [3] - 13:9, 13:10, 13:22
**intellectually** [1] - 36:5
**intend** [1] - 6:3
**intended** [3] - 14:10, 14:18, 15:2
**interest** [3] - 30:18, 30:23, 37:4
**interesting** [1] - 44:14
**internal** [1] - 21:21
**internationally** [2] - 27:20, 27:25
**interpreted** [1] - 15:18
**introduced** [2] -

18:16, 19:10
**involving** [2] - 27:8, 27:22
**irremediable** [1] - 32:25
**issuance** [1] - 4:8
**issue** [29] - 7:23, 10:14, 13:21, 16:8, 16:10, 21:7, 23:22, 27:5, 28:9, 31:4, 33:5, 35:5, 35:9, 35:10, 35:14, 35:18, 35:24, 35:25, 36:19, 38:2, 40:2, 41:22, 41:23, 42:2, 42:4, 42:9, 42:10
**issuer** [1] - 38:22
**issuers** [3] - 37:21, 38:2, 38:3
**issues** [3] - 9:4, 9:6, 43:14
**Italy** [1] - 19:5
**itself** [1] - 19:25

## J

**job** [1] - 43:10
**JOHN** [1] - 1:21
**John** [1] - 3:23
**joint** [1] - 29:24
**jot** [1] - 38:5
**JUDGE** [1] - 1:12
**Judge** [9] - 6:24, 15:12, 15:16, 27:10, 27:15, 27:17, 28:3, 39:12, 39:17
**judge** [4] - 6:24, 7:21, 7:24, 37:7
**judges** [3] - 7:2, 7:3, 37:5
**judicial** [4] - 6:18, 7:4, 7:7, 7:16
**juice** [5] - 11:15, 11:17, 11:19, 12:13, 24:18
**jurisdictional** [1] - 22:4
**jurisdictions** [2] - 22:6, 22:7
**just..** [1] - 44:8
**Justice** [1] - 15:16
**justified** [2] - 17:24, 18:24

## K

**KATHERINE** [1] - 2:1
**Katie** [1] - 3:24
**keep** [1] - 36:16
**KELLY** [2] - 1:17, 1:18
**Kelly** [1] - 3:20

**key** [1] - 9:9
**kind** [2] - 4:17, 36:7
**kinds** [2] - 33:7, 33:18
**kiosk** [2] - 19:4, 19:5
**knows** [3] - 26:10, 26:15, 42:3
**KRISHNENDU** [1] - 1:4
**KRISTI** [1] - 1:17
**Kristi** [1] - 3:20

## L

**label** [1] - 39:25
**labeled** [1] - 13:17
**lack** [1] - 40:21
**laid** [1] - 37:2
**land** [1] - 14:16
**Langan** [1] - 35:16
**language** [24] - 5:13, 9:7, 13:3, 14:7, 14:11, 16:10, 16:11, 17:4, 17:6, 17:7, 20:3, 24:5, 26:5, 26:11, 27:5, 27:15, 27:16, 28:8, 28:10, 39:18, 40:1, 40:2, 40:3, 40:7
**large** [2] - 14:16, 32:18
**larger** [2] - 6:22, 13:16
**largest** [1] - 38:20
**last** [3] - 8:11, 8:13, 39:11
**law** [5] - 6:13, 13:1, 13:6, 32:18, 38:13
**lawsuit** [1] - 33:14
**lawsuits** [1] - 21:23
**lawyer** [1] - 44:5
**lawyers** [4] - 32:8, 32:11, 32:14
**lay** [1] - 23:12
**lead** [1] - 9:3
**least** [7] - 7:25, 9:21, 10:16, 14:24, 18:9, 41:25, 43:1
**leave** [1] - 3:14
**led** [1] - 13:20
**left** [1] - 38:15
**legal** [2] - 30:1, 30:5
**legitimacy** [1] - 7:6
**legitimate** [1] - 7:17
**Lehnen** [1] - 3:24
**LEHNEN** [1] - 2:1
**level** [2] - 12:15, 37:7
**liability** [2] - 9:3, 29:24
**liable** [2] - 36:22, 36:23
**life** [1] - 30:23
**light** [1] - 19:17

**likelihood** [1] - 7:20
**likely** [1] - 22:6
**limitation** [1] - 14:2
**line** [8] - 13:15, 13:18, 13:20, 13:24, 14:1, 14:4, 26:18, 39:22
**lira** [2] - 19:6, 19:7
**listening** [1] - 34:11
**litigation** [3] - 32:10, 39:17, 40:3
**lived** [1] - 6:21
**Lives** [1] - 1:23
**LLP** [2] - 1:21, 2:2
**local** [2] - 4:12, 43:6
**long-winded** [1] - 15:24
**look** [12] - 8:6, 8:15, 10:12, 10:17, 15:20, 22:15, 32:12, 36:11, 36:20, 39:24, 42:12, 42:16
**looked** [4] - 7:9, 16:9, 42:7, 42:13
**looks** [1] - 40:3
**loud** [1] - 7:20
**louder** [1] - 35:6
**loves** [1] - 13:13

## M

**main** [2] - 9:4, 9:6
**man** [1] - 6:20
**mandated** [1] - 16:22
**manner** [2] - 20:20, 40:14
**mark** [4] - 41:9, 41:14, 43:15, 43:16
**market** [5] - 14:20, 19:2, 20:14, 20:16, 25:14
**markets** [2] - 18:9, 18:10
**Maryland** [1] - 14:17
**mask** [3] - 3:9, 3:12, 35:7
**Master** [9] - 4:15, 8:3, 8:4, 8:5, 8:8, 12:8, 29:25, 34:20, 35:2
**master** [1] - 43:23
**MasterCard** [39] - 4:9, 4:24, 5:11, 10:20, 11:10, 12:10, 16:14, 16:20, 16:21, 21:15, 21:16, 21:25, 23:1, 23:11, 23:12, 23:15, 23:16, 23:17, 23:22, 25:10, 26:2, 26:3, 26:22, 29:1, 29:4, 29:7, 29:13, 29:20, 30:9, 30:10, 30:14,

37:20, 38:20, 39:2, 39:9, 40:10, 40:11, 44:4
**MasterCard's** [3] - 24:15, 26:23, 44:5
**material** [1] - 7:20
**Matter** [1] - 1:23
**matter** [7] - 3:25, 4:20, 11:13, 33:14, 33:24, 40:22, 45:5
**matters** [3] - 5:15, 8:25, 36:5
**McGuire** [3] - 1:21, 2:2, 6:21
**mean** [3] - 12:21, 15:6, 25:19
**means** [8] - 17:20, 17:21, 23:4, 23:5, 23:16, 24:15, 24:16, 25:4
**meant** [1] - 9:25
**measure** [3] - 30:6, 30:11, 30:13
**meet** [2] - 18:5, 18:11
**mention** [1] - 12:17
**merchant** [1] - 19:8
**merchants** [1] - 30:22
**mercy** [1] - 38:10
**mere** [2] - 13:3, 15:22
**merely** [6] - 14:1, 14:12, 16:6, 28:13, 28:16, 29:21
**Merhige** [1] - 6:24
**merits** [2] - 39:14, 42:5
**Merry** [1] - 44:19
**metaphors** [3] - 11:18, 11:22, 24:23
**MICHAEL** [1] - 1:4
**Michelle** [2] - 3:6, 3:18
**MICHELLE** [1] - 1:14
**mid** [1] - 6:25
**might** [5] - 7:1, 7:23, 20:13, 39:5, 41:1
**mind** [2] - 24:18, 31:14
**Minneapolis** [2] - 1:16, 43:3
**minute** [1] - 5:14
**minutes** [1] - 34:16
**mirror** [1] - 39:20
**misrepresentation** [1] - 33:23
**mixing** [1] - 24:22
**MN** [1] - 1:16
**moment** [1] - 9:7
**Monday** [1] - 29:19
**money** [3] - 19:9, 23:6, 33:8
**MONTAGUE** [1] - 1:14

**MORAN** [30] - 1:21, 3:23, 4:6, 4:18, 5:3, 5:6, 5:12, 5:21, 5:24, 6:6, 6:15, 7:8, 7:19, 8:10, 8:13, 8:19, 9:5, 11:20, 12:1, 12:12, 12:15, 21:11, 37:1, 37:18, 37:25, 39:1, 40:20, 41:24, 42:19, 43:5
**Moran** [7] - 3:23, 4:4, 9:1, 21:14, 30:25, 36:11, 42:21
**most** [3] - 10:14, 12:15, 13:8
**MOTION** [1] - 1:11
**motion** [6] - 4:1, 6:3, 9:18, 29:5, 29:12, 31:9
**motions** [1] - 29:14
**movant** [2] - 4:5, 21:9
**move** [3] - 6:3, 13:25, 37:13
**moving** [1] - 4:2
**MR** [29] - 3:23, 4:6, 4:18, 5:3, 5:6, 5:12, 5:21, 5:24, 6:6, 6:15, 7:8, 7:19, 8:10, 8:13, 8:19, 9:5, 11:20, 12:1, 12:12, 12:15, 21:11, 37:1, 37:18, 37:25, 39:1, 40:20, 41:24, 42:19, 43:5
**MS** [42] - 3:6, 3:14, 3:18, 8:23, 21:17, 21:20, 22:20, 23:22, 23:25, 24:2, 24:24, 25:2, 25:16, 25:20, 25:24, 26:19, 27:4, 29:14, 29:16, 29:18, 30:1, 30:5, 31:2, 31:12, 31:16, 31:21, 31:24, 33:3, 33:13, 34:24, 35:4, 35:8, 35:15, 43:4, 43:8, 43:12, 43:21, 43:24, 44:1, 44:3, 44:12, 44:17
**multiple** [1] - 22:6
**multiplicity** [1] - 20:2
**must** [2] - 38:15, 42:23
**Mutual** [3] - 13:8, 13:10, 13:22

## N

**N.A** [2] - 1:8, 1:9
**NA** [1] - 3:3
**named** [3] - 5:18, 6:1, 10:14

**natural** [1] - 9:10
**nature** [2] - 27:6, 27:16
**NE** [1] - 1:15
**nearly** [1] - 42:22
**necessarily** [2] - 7:19, 7:22
**necessary** [1] - 8:17
**need** [8] - 6:15, 7:13, 31:12, 31:14, 35:1, 37:2, 42:2, 42:15
**negligent** [1] - 34:4
**negotiating** [1] - 14:15
**negotiation** [1] - 14:24
**Network** [6] - 10:19, 10:21, 11:7, 12:19, 16:1, 25:25
**network** [3] - 9:24, 10:5, 40:9
**networks** [5] - 10:3, 11:5, 11:12, 13:4, 38:21
**never** [1] - 31:14
**New** [3] - 21:16, 44:4, 44:19
**new** [4] - 11:18, 18:16, 19:3, 19:10
**nice** [1] - 44:7
**nicely** [1] - 15:10
**nobody** [1] - 35:23
**noncontractual** [1] - 27:7
**North** [1] - 22:12
**note** [3] - 13:2, 21:24, 23:19
**noted** [2] - 15:16, 19:4
**NOTES** [1] - 2:11
**nothing** [5] - 11:2, 13:2, 19:11, 29:3, 36:9
**notice** [6] - 23:21, 27:12, 27:14, 28:14, 28:19, 39:19
**noticed** [1] - 19:6
**number** [2] - 4:4, 9:23
**Number** [2] - 1:4, 3:4
**NW** [1] - 1:22

## O

**objectively** [2] - 17:24, 18:24
**obligation** [1] - 34:14
**observing** [1] - 44:6
**obtained** [3] - 18:8, 18:9, 30:11
**obviously** [1] - 39:2
**occurs** [2] - 5:9, 36:18
**OF** [5] - 1:1, 1:11, 2:11, 45:1, 45:10

**offhand** [1] - 29:20
**officers** [4] - 6:19, 7:4, 7:7, 7:16
**OFFICIAL** [2] - 2:5, 45:1
**often** [3] - 11:24, 14:9, 32:10
**old** [4] - 4:10, 6:20, 7:1
**ON** [1] - 1:25
**once** [3] - 12:6, 12:13, 41:5
**one** [26] - 8:5, 9:8, 10:13, 11:18, 11:19, 11:24, 12:16, 15:8, 17:5, 21:24, 22:8, 24:20, 28:18, 30:3, 30:4, 31:4, 31:12, 31:13, 34:12, 34:20, 35:5, 36:7, 37:6, 37:19, 39:10, 43:19
**One** [65] - 3:3, 4:8, 4:15, 5:6, 6:9, 8:4, 9:2, 9:10, 9:12, 9:16, 10:8, 11:4, 11:11, 11:13, 13:4, 16:3, 17:2, 18:1, 18:17, 19:18, 19:23, 20:23, 21:14, 22:1, 22:21, 23:1, 23:14, 23:18, 24:3, 24:4, 24:6, 24:7, 24:8, 24:9, 25:8, 25:24, 26:10, 26:15, 27:10, 27:11, 27:13, 27:19, 28:2, 28:4, 28:7, 28:8, 28:11, 28:20, 28:21, 29:7, 37:22, 38:9, 38:17, 39:4, 39:7, 39:14, 40:4, 40:15, 40:21, 41:4, 41:7, 41:9, 41:12, 41:19
**ONE** [2] - 1:8, 1:9
**One's** [4] - 26:7, 28:11, 41:6, 41:10
**ones** [1] - 8:8
**operate** [3] - 13:14, 13:17, 13:23
**operated** [2] - 13:19, 14:3
**operator** [3] - 13:12, 13:16, 13:25
**opinion** [4] - 15:12, 27:10, 32:6, 35:16
**opportunities** [1] - 41:20
**opportunity** [1] - 21:9
**opposite** [1] - 29:6
**opposition** [2] - 9:13, 17:4
**options** [1] - 10:3

**oral** [1] - 29:19
**order** [1] - 6:13
**organic** [2] - 33:18, 33:19
**ought** [1] - 37:7
**outcome** [2] - 35:12, 40:24
**outset** [1] - 17:14
**outside** [2] - 16:16, 28:5
**outsource** [1] - 38:18
**overpaid** [1] - 32:17
**overseas** [1] - 28:17
**own** [11] - 10:21, 11:8, 11:10, 12:20, 13:5, 16:2, 22:21, 22:25, 25:25, 27:12, 41:13

## P

**p.m** [3] - 1:6, 34:18, 44:20
**package** [1] - 33:24
**PAGE** [1] - 1:25
**page** [3] - 10:16, 16:12, 35:17
**pages** [1] - 2:9
**paid** [4] - 18:1, 18:4, 20:10, 20:13
**paragraph** [1] - 11:3
**Paragraph** [6] - 18:2, 18:7, 18:13, 18:23, 19:3, 25:21
**Paragraphs** [4] - 23:11, 25:16, 26:3, 34:21
**part** [4] - 4:3, 7:9, 15:5, 22:14
**participants** [1] - 19:2
**particular** [16] - 5:8, 11:5, 11:6, 13:19, 16:5, 16:6, 17:3, 22:18, 22:19, 22:24, 24:8, 24:10, 28:13, 38:2, 39:22
**particularity** [6] - 17:12, 19:17, 19:19, 20:2, 20:23, 21:2
**particularly** [3] - 19:16, 32:11, 32:25
**parties** [5] - 14:13, 14:15, 15:4, 15:15, 32:11
**partner** [1] - 32:18
**partners** [1] - 24:20
**parts** [1] - 15:17
**party** [9] - 14:4, 14:12, 15:19, 19:23, 27:7, 36:19, 36:25, 38:19, 44:11

**pay** [1] - 30:19
**payment** [4] - 9:17, 38:21, 40:8
**Payment** [6] - 10:19, 10:21, 11:7, 12:19, 16:1, 25:25
**PC** [1] - 1:14
**PDF** [2] - 10:16, 16:12
**penalized** [1] - 41:19
**pending** [1] - 44:2
**people** [2] - 5:1, 38:8
**PEPCO** [2] - 6:23, 7:2
**perform** [2] - 15:18, 17:9
**perhaps** [2] - 25:2, 35:2
**person** [2] - 34:12, 44:7
**perspective** [1] - 22:4
**phrase** [3] - 18:19, 24:17, 24:18
**piece** [2] - 14:14, 17:10
**place** [2] - 21:4, 22:4
**plaintiff** [14] - 3:5, 3:7, 5:22, 7:3, 14:19, 14:23, 16:7, 21:7, 33:19, 36:7, 36:23, 41:23, 41:24, 42:1
**plaintiff's** [2] - 5:24, 38:8
**plaintiffs** [36] - 1:6, 3:19, 4:14, 4:15, 4:19, 5:7, 5:18, 6:1, 6:8, 6:18, 7:11, 8:18, 8:21, 9:13, 10:14, 11:9, 12:4, 16:9, 17:3, 17:15, 19:25, 20:5, 20:19, 20:24, 27:17, 28:25, 29:8, 29:11, 31:4, 31:8, 33:23, 35:23, 40:17, 40:22, 41:6, 41:15
**PLAINTIFFS** [1] - 1:14
**plaintiffs'** [2] - 37:6, 39:12
**plane** [1] - 19:5
**Plaza** [2] - 1:23, 2:2
**PLC** [1] - 1:18
**plea** [1] - 15:13
**plead** [1] - 20:19
**pleading** [3] - 17:12, 19:17, 19:19
**pleadings** [1] - 19:22, 26:12
**pled** [3] - 21:25, 30:9, 30:10
**plus** [1] - 11:25, 42:22
**podium** [2] - 3:8, 3:12
**point** [20] - 5:12, 5:17,

6:17, 8:10, 9:8, 15:8, 17:19, 20:22, 22:14, 31:25, 32:1, 32:23, 34:3, 34:6, 34:9, 34:20, 36:4, 37:19, 39:11, 42:14
**policies** [2] - 27:12, 27:14
**poor** [1] - 25:2
**position** [3] - 5:10, 6:12, 12:12
**possesses** [1] - 29:9
**possibility** [1] - 37:3
**posted** [2] - 16:18, 16:25
**posture** [1] - 42:6
**potential** [1] - 22:9
**potentially** [1] - 20:11
**power** [1] - 15:19
**practice** [1] - 19:18
**practiced** [1] - 6:22
**practices** [1] - 27:22
**precise** [2] - 9:20, 29:21
**precisely** [1] - 23:13
**preliminary** [2] - 5:15, 8:24
**premature** [1] - 36:2
**prepared** [1] - 8:15
**presiding** [1] - 6:24
**press** [2] - 31:9, 31:24
**pretty** [1] - 34:3
**principle** [3] - 13:8, 15:10, 38:13
**priority** [1] - 27:19
**privacy** [2] - 27:12, 27:14
**privity** [1] - 29:8
**problem** [7] - 7:7, 7:18, 19:21, 32:5, 32:24, 35:3, 36:14
**problematic** [1] - 32:2
**procedure** [2] - 24:8, 24:11
**procedures** [34] - 9:16, 9:20, 9:22, 10:9, 10:22, 11:8, 11:11, 12:9, 12:20, 12:23, 13:5, 16:2, 17:3, 22:1, 22:25, 23:4, 23:8, 23:10, 23:13, 23:16, 23:23, 24:15, 25:10, 26:1, 26:21, 26:24, 36:16, 36:21, 36:22, 40:10, 40:15
**proceedings** [1] - 45:4
**process** [2] - 11:5, 44:15
**processed** [5] - 16:5,

16:16, 16:24, 38:20, 39:8

**processing** [4] - 10:23, 26:24, 30:20, 38:21

**processor** [1] - 10:5

**processor's** [1] - 26:6

**processors** [18] - 9:16, 18:1, 22:2, 22:5, 22:16, 22:17, 22:23, 22:24, 23:3, 23:7, 24:5, 28:23, 30:20, 31:17, 40:19, 43:20, 43:21

**processors'** [5] - 18:20, 22:6, 23:3, 23:8, 28:3

**products** [1] - 33:17

**profit** [4] - 19:9, 30:14, 30:16, 32:8

**profits** [1] - 32:10

**promise** [33] - 9:9, 9:11, 9:22, 10:8, 13:7, 13:25, 14:12, 15:1, 15:19, 15:23, 16:3, 17:9, 18:17, 19:12, 20:4, 21:4, 22:15, 22:18, 22:22, 25:22, 28:5, 33:15, 34:14, 36:13, 36:16, 37:11, 38:2, 38:9, 38:16, 39:20, 39:24, 40:21, 40:23

**promised** [7] - 9:12, 9:16, 14:24, 24:12, 29:3, 30:8, 36:21

**promises** [5] - 9:14, 9:19, 14:10, 15:18, 36:12

**promising** [3] - 11:12, 17:2, 24:7

**promissory** [2] - 13:3, 40:1

**prompted** [1] - 8:2

**proper** [2] - 33:5, 36:7

**properly** [2] - 35:9, 42:10

**property** [1] - 14:19

**proprietary** [1] - 7:6

**propriety** [1] - 21:22

**protect** [1] - 27:20

**providing** [1] - 28:13

**provision** [4] - 7:15, 11:1, 11:16, 17:1

**provisions** [6] - 9:2, 32:4, 33:1, 33:14, 34:21, 34:24

**Prudence** [1] - 31:15

**prudential** [2] - 36:6, 36:9

**public** [1] - 23:2

**publicly** [1] - 23:12

**published** [7] - 12:22, 23:10, 23:18, 23:20, 23:23, 26:6, 26:25

**pump** [3] - 13:12, 13:14, 13:18, 13:19

**pumps** [1] - 13:13

**purchase** [2] - 16:24, 16:25

**pursue** [1] - 36:8

**put** [5] - 20:5, 25:18, 37:14, 37:19

## Q

**quality** [1] - 42:24

**quarrel** [1] - 29:8

**questioned** [1] - 7:6

**questions** [5] - 4:4, 9:9, 9:23, 10:11, 20:6

**quote** [21] - 9:14, 9:15, 10:4, 12:19, 15:17, 16:1, 16:16, 16:17, 17:16, 17:17, 17:18, 17:23, 18:7, 18:9, 18:14, 18:15, 18:16, 18:24, 19:2

## R

**railroad** [1] - 42:15

**raise** [1] - 22:8

**raised** [3] - 16:9, 42:3, 43:14

**raises** [1] - 37:18

**raising** [1] - 36:4

**random** [2] - 24:13, 24:14

**rate** [65] - 4:10, 4:16, 4:22, 4:24, 5:1, 5:8, 8:9, 9:24, 10:1, 10:2, 10:3, 10:6, 10:22, 10:23, 10:25, 11:3, 11:5, 11:14, 12:9, 16:4, 16:5, 16:19, 16:20, 16:21, 16:22, 16:23, 17:16, 17:17, 18:6, 18:8, 19:6, 19:7, 20:6, 20:8, 20:9, 20:12, 20:14, 20:25, 22:16, 22:18, 22:19, 24:7, 24:10, 24:11, 25:12, 25:14, 25:23, 26:9, 26:22, 28:22, 28:24, 32:18, 32:19, 33:16, 38:2, 39:8, 40:12, 41:5, 41:8, 41:10, 41:14, 41:16

**rates** [32] - 4:14, 4:21, 9:17, 10:9, 11:6, 17:6, 17:24, 18:1, 18:3, 18:4, 18:5, 18:7, 18:12, 18:13, 18:18, 18:21, 18:25, 19:12, 19:21, 20:10, 20:13, 20:21, 20:22, 20:24, 24:4, 24:19, 25:8, 25:9, 29:10, 30:15, 30:16

**rather** [1] - 17:2

**re** [1] - 19:24

**re-create** [1] - 19:24

**reach** [2] - 7:13, 11:23

**real** [3] - 5:25, 8:7, 38:24

**reality** [3] - 14:4, 19:22, 41:17

**really** [5] - 25:9, 31:8, 31:12, 31:16, 36:6

**reason** [4] - 15:5, 17:13, 26:19, 36:4

**reasonable** [3] - 4:1, 19:1, 19:13

**reasonably** [1] - 10:10

**reasoning** [1] - 21:24

**reasons** [2] - 12:16, 37:1

**Rebecca** [1] - 45:3

**REBECCA** [1] - 2:5

**receive** [4] - 25:13, 30:19, 30:20, 30:21

**received** [2] - 17:17, 30:8

**recess** [4] - 32:22, 34:7, 34:16

**Recess** [1] - 34:18

**recitations** [1] - 15:15

**recited** [1] - 15:22

**recites** [1] - 13:4

**recognized** [2] - 27:21, 27:25

**record** [3] - 39:4, 44:20, 45:4

**recovery** [1] - 30:4

**recusal** [1] - 8:18

**recuse** [1] - 7:3

**reference** [10] - 11:11, 12:18, 12:25, 22:25, 26:7, 26:8, 27:23, 27:25, 28:3, 28:5

**referred** [1] - 26:23

**referring** [1] - 26:23

**refreshing** [1] - 42:23

**regard** [3] - 22:17, 28:21, 33:13

**regulations** [2] - 27:21, 28:1

**related** [3] - 6:11,

20:13, 22:10

**relates** [1] - 18:10

**relationship** [6] - 18:21, 19:1, 19:13, 20:7, 20:9, 28:25

**relevant** [2] - 12:3, 17:13

**relied** [2] - 12:4, 15:5

**relief** [4] - 6:10, 7:23, 35:22

**rely** [1] - 36:13

**remains** [1] - 39:2

**remedy** [1] - 29:9

**reminisce** [1] - 6:20

**reminiscing** [1] - 6:19

**remove** [1] - 3:9

**removed** [1] - 3:12

**rental** [2] - 13:11, 13:24

**rented** [1] - 14:4

**renter** [2] - 14:2, 14:7

**renting** [1] - 13:15

**reporter** [2] - 3:11, 3:15

**REPORTER** [3] - 2:5, 45:1, 45:10

**represent** [2] - 6:2, 44:9

**representation** [1] - 27:18

**representative** [1] - 35:2

**represented** [2] - 6:23, 14:18

**reputable** [1] - 38:22

**requesting** [1] - 8:19

**required** [4] - 4:22, 4:23, 20:12

**requirement** [2] - 19:17, 21:3

**resemblance** [3] - 17:25, 18:4, 18:8

**resolved** [2] - 7:2, 32:3

**respect** [6] - 4:3, 5:18, 11:14, 12:2, 24:19, 30:17

**respectfully** [1] - 41:3

**respond** [2] - 21:9, 30:25, 34:8

**response** [5] - 9:18, 29:5, 34:11, 34:13, 37:10

**responses** [1] - 38:12

**responsibility** [1] - 38:18

**responsible** [1] - 41:20

**result** [1] - 22:19

**retract** [2] - 11:20,

11:22

**rhetorical** [1] - 34:23

**Richmond** [1] - 2:3, 6:22, 43:3

**Road** [1] - 1:18

**rocket** [4] - 24:20, 24:22, 24:25, 25:5

**RPR** [1] - 2:5

**Rule** [8] - 19:17, 33:6, 35:10, 35:18, 35:21, 35:25, 36:19, 42:11

**ruled** [1] - 39:18

**rules** [32] - 10:5, 11:11, 12:17, 18:20, 23:1, 23:17, 26:1, 26:2, 26:3, 26:6, 26:8, 26:15, 26:25, 28:3, 37:21, 37:25, 38:1, 38:3, 40:11, 40:18, 40:25, 41:1, 41:3, 41:5, 41:6, 41:7, 41:18, 44:16

**Rules** [2] - 12:22, 12:23

**ruling** [1] - 39:12

**run** [2] - 14:6, 42:15

## S

**safest** [1] - 22:4

**salary** [1] - 32:16

**sale** [1] - 14:16

**salient** [1] - 26:20

**science** [2] - 24:25, 25:6

**seated** [1] - 36:10

**Second** [3] - 15:11, 35:16, 42:8

**security** [5] - 27:19, 27:21, 27:25, 39:13, 39:17

**see** [9] - 4:12, 4:13, 5:25, 6:17, 7:18, 32:1, 35:10, 37:4, 44:7

**seek** [2] - 8:18, 32:14

**seeks** [1] - 6:10

**select** [1] - 11:6

**selected** [3] - 10:2, 16:20, 39:9

**selecting** [1] - 9:17

**self** [2] - 22:21, 28:9

**self-termed** [1] - 22:21, 28:9

**sell** [1] - 33:18

**senior** [1] - 6:25

**sense** [2] - 7:25, 24:12

**sentencing** [1] - 15:16

**separate** [1] - 21:6

**separately** [1] - 43:25

series [3] - 20:17, 38:22, 40:5
set [10] - 4:24, 17:3, 26:1, 26:24, 29:10, 29:19, 29:22, 34:21, 41:5, 41:8
setting [2] - 20:1, 21:2
settle [2] - 18:16, 30:21
several [1] - 29:25
shall [1] - 14:11
shield [1] - 3:10
short [1] - 5:25
show [3] - 6:15, 19:16, 21:3
shows [1] - 20:3
sic [1] - 13:24
sIGNATURE [1] - 45:10
significant [5] - 26:14, 26:16, 29:3, 34:13, 40:18
similarly [1] - 1:5
similes [2] - 11:18, 11:23
simple [3] - 11:2, 25:12, 40:14
simply [1] - 15:17
single [1] - 10:2
site [2] - 13:16, 14:5
situated [2] - 1:5, 30:17
skin [1] - 7:22
slightly [1] - 6:6
smart [1] - 42:14
Smith [3] - 13:9, 14:14, 14:15
snow [1] - 43:6
someone [3] - 28:16, 32:15, 36:8
somewhat [1] - 30:13
somewhere [2] - 32:20, 38:16
son [1] - 13:13
Sonia [1] - 15:12
sort [4] - 13:12, 19:12, 26:16, 39:4
Sotomayor [2] - 15:12, 15:16
SPEAKER [1] - 44:9
specific [12] - 5:13, 9:14, 9:15, 9:19, 11:3, 12:24, 17:3, 19:11, 22:15, 27:16, 40:5, 40:9
specifically [1] - 7:9
specification [1] - 25:12
specifies [1] - 5:8
specify [3] - 9:22,

25:11, 26:9
spend [2] - 33:2, 33:4
spread [6] - 18:25, 19:1, 19:8, 19:14, 20:8, 30:21
Square [1] - 2:6
squarely [1] - 10:14
squeeze [5] - 11:15, 11:17, 11:19, 12:14, 24:18
stage [2] - 31:9, 36:2
standard [2] - 19:20, 20:2
standards [5] - 27:21, 27:24, 27:25, 28:5, 40:5
standing [23] - 4:3, 5:18, 5:20, 6:15, 16:8, 21:6, 21:8, 27:2, 30:24, 31:3, 31:7, 32:6, 32:23, 32:24, 35:3, 35:5, 35:9, 35:14, 36:6, 41:22, 42:4, 42:9
standpoint [2] - 31:5, 33:13
stands [1] - 34:16
stark [1] - 16:11
start [2] - 16:22, 17:5
started [1] - 10:6
starts [2] - 10:5, 26:22
state [1] - 17:11
statement [6] - 10:24, 12:19, 15:21, 15:25, 16:25, 39:23
statements [2] - 14:9, 36:12
STATES [2] - 1:1, 1:12
States [3] - 15:10, 15:14, 16:16
states [2] - 22:24, 25:24
status [2] - 6:25, 29:22
STENOGRAPHIC [1] - 2:11
steps [4] - 11:4, 11:14, 16:4, 40:5
still [4] - 6:21, 34:4, 39:22, 41:15
Stonestreet [2] - 45:3, 45:9
STONESTREET [1] - 2:5
strategy [1] - 21:23
strawberry [1] - 33:22
Street [3] - 1:15, 1:22, 2:3
strongly [1] - 35:20
structure [1] - 21:22

stuff [1] - 4:13
stupid [1] - 34:4
styled [2] - 39:19, 39:21
submit [1] - 17:1
subsidiary [1] - 20:6
substantive [1] - 8:10
succeeded [1] - 6:24
sue [6] - 14:6, 21:14, 22:5, 29:10, 33:20, 44:11
sued [3] - 14:23, 22:10, 36:20
sufficient [3] - 8:24, 13:5, 31:7
suing [1] - 21:15
suit [1] - 13:20
Suite [3] - 1:15, 1:19, 1:22
suits [2] - 43:19, 43:21
super [1] - 25:4
supplying [1] - 13:16
support [1] - 35:20
supported [2] - 6:12, 35:22
supposed [4] - 10:1, 10:6, 20:24, 21:18
Supreme [1] - 35:19
surgery [4] - 24:20, 24:22, 24:25, 25:5
survive [1] - 6:3

**T**

T.S [1] - 1:11
tactic [1] - 37:6
tea [6] - 33:19, 33:21, 33:22, 33:23, 33:24, 43:16
teas [1] - 37:12
term [3] - 5:8, 28:14, 29:4
termed [2] - 22:21, 28:9
terms [1] - 9:11
text [1] - 39:22
textbook [1] - 31:5
THE [77] - 1:1, 1:11, 1:14, 1:21, 2:1, 3:8, 3:16, 3:21, 3:25, 4:7, 4:23, 5:5, 5:10, 5:14, 5:22, 6:5, 6:14, 6:16, 7:13, 8:2, 8:12, 8:17, 8:21, 8:24, 11:17, 11:22, 12:6, 12:13, 21:5, 21:12, 21:18, 22:13, 23:20, 23:24, 24:1, 24:22, 25:1, 25:15, 25:17, 25:22, 26:14, 27:1, 29:12,

29:15, 29:17, 29:23, 30:3, 30:23, 31:11, 31:14, 31:18, 31:22, 32:1, 33:11, 34:3, 34:19, 35:1, 35:6, 35:13, 36:9, 37:4, 37:24, 38:24, 40:18, 41:22, 42:7, 42:20, 43:6, 43:10, 43:14, 43:23, 43:25, 44:2, 44:7, 44:10, 44:14, 44:18
themselves [5] - 1:5, 4:19, 7:3, 12:17, 37:21
theories [3] - 20:3, 20:11, 20:16
theory [3] - 17:22, 19:20, 19:25
therefore [1] - 36:22
they've [2] - 10:6, 19:9
thinking [2] - 6:19, 22:23
third [5] - 27:7, 36:19, 36:25, 38:18, 44:11
third-party [2] - 36:19, 36:25, 44:11
thoughtful [1] - 35:17
thousands [1] - 14:18
three [2] - 14:22, 29:25
threshold [1] - 42:4
TIFFANY [1] - 1:3
today [9] - 3:19, 6:7, 7:10, 7:14, 8:15, 32:21, 40:23, 42:8, 44:6
together [1] - 21:15
took [1] - 6:25
top [1] - 27:19
tract [1] - 14:16
traction [1] - 19:25
trade [2] - 17:11, 19:18
transaction [12] - 5:9, 9:25, 10:4, 10:19, 10:24, 16:17, 16:23, 17:11, 20:15, 23:15, 28:15, 38:7
Transactions [1] - 10:17
transactions [19] - 4:21, 9:18, 11:6, 16:13, 16:14, 16:15, 16:17, 17:25, 18:16, 19:24, 28:19, 30:18, 30:22, 37:23, 38:19, 39:8, 39:10
transcript [1] - 45:4
TRANSCRIPT [1] -

1:11
TRANSCRIPTION [1] - 2:11
Trenga [4] - 27:15, 27:17, 28:3, 39:17
Trenga's [2] - 27:10, 39:12
true [3] - 7:1, 8:21, 32:3
truly [1] - 35:17
try [1] - 11:9, 20:5
trying [1] - 17:7
turn [2] - 14:6, 29:11
turned [1] - 14:22
two [16] - 9:4, 9:5, 12:16, 13:7, 17:6, 27:8, 30:17, 35:4, 35:19, 38:12, 38:20, 41:17, 42:20, 43:9, 43:20, 43:21
Tyler [1] - 1:15
type [1] - 16:5
types [1] - 17:6
typical [1] - 36:18

**U**

U.S [4] - 2:6, 10:21, 16:19, 16:20
ultimate [1] - 29:10
ultimately [1] - 14:5
unbelievable [1] - 32:21
uncertain [1] - 32:2
under [6] - 10:17, 13:1, 13:6, 19:17, 19:19, 20:22
undergirds [1] - 24:6
underscore [1] - 35:1
underscores [1] - 40:20
undisclosed [1] - 16:4
unenforceable [1] - 28:13
unfair [3] - 12:23, 17:11, 19:18
unfettered [3] - 28:22, 28:23, 38:10
UNIDENTIFIED [1] - 44:9
UNITED [2] - 1:1, 1:12
United [3] - 15:10, 15:14, 16:16
unknown [1] - 38:18
unless [1] - 3:13
unpaid [1] - 30:18
unscrupulous [1] - 38:19
up [10] - 10:17, 32:5, 33:17, 34:12, 37:8,

39:12, 41:9, 41:14,
41:23, 43:7
**upheld** [1] - 27:15
**USA** [2] - 1:8, 3:3
**uses** [2] - 4:9, 10:5
**Utica** [3] - 13:8, 13:10,
13:22

## V

**VA** [2] - 1:19, 2:3
**valid** [1] - 37:17
**various** [1] - 22:2
**vary** [2] - 22:2, 22:3
**versus** [1] - 3:3
**view** [12] - 4:24, 6:6,
7:10, 8:7, 8:25, 9:21,
13:6, 24:5, 26:5,
37:8, 42:14
**violated** [1] - 19:20
**Virginia** [6] - 2:7, 13:1,
13:6, 15:9, 22:10,
28:7
**VIRGINIA** [1] - 1:1
**Visa** [50] - 4:9, 4:16,
4:24, 5:11, 8:3, 8:5,
8:8, 10:20, 11:10,
12:8, 12:10, 21:15,
21:25, 22:9, 23:1,
23:6, 23:11, 23:12,
23:15, 23:16, 23:17,
23:22, 24:15, 25:10,
26:2, 26:3, 26:23,
28:25, 29:4, 29:7,
29:13, 29:22, 29:25,
30:8, 30:10, 30:14,
33:6, 37:20, 38:20,
39:2, 39:9, 40:11,
43:23, 44:3, 44:5,
44:9
**vs** [6] - 13:9, 14:14,
14:15, 15:10, 28:7,
35:19

## W

**wall** [1] - 35:11
**wants** [1] - 28:22
**Washington** [1] - 1:23
**watch** [1] - 13:13
**ways** [1] - 16:10
**week** [1] - 43:8
**weigh** [1] - 39:13
**weight** [2] - 8:16, 20:4
**whereas** [1] - 30:20
**whole** [3] - 11:25,
16:7, 34:6
**wholesale** [21] - 10:1,
10:2, 10:5, 16:23,
17:16, 17:17, 18:6,
18:9, 18:10, 18:12,

18:18, 19:2, 20:14,
20:15, 25:13, 25:23,
26:9, 26:22, 33:15,
33:16, 40:12
**wife** [2] - 8:3, 8:4
**WILSON** [1] - 1:3
**winded** [1] - 15:24
**wish** [1] - 42:24
**wonder** [1] - 33:2
**WOODS** [2] - 1:21, 2:2
**Woods** [1] - 6:21
**words** [1] - 4:10
**works** [1] - 17:5
**world** [1] - 38:21
**WRIGHT** [1] - 1:3
**Wright** [1] - 3:3
**writing** [4] - 32:5,
33:2, 33:4, 35:10
**wrongly** [1] - 30:11

## Y

**Year** [1] - 44:19
**year** [1] - 32:17
**years** [5] - 6:20, 32:13,
37:9, 42:22
**York** [2] - 21:16, 44:4